IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COUNTY OF SANTA CLARA, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ASTRA USA, INC.; ASTRAZENECA PHARMACEUTICALS LP; AVENTIS PHARMACEUTICALS, INC.; BAYER CORP.; BRISTOL-MYERS SQUIBB CO.; PFIZER, INC.; SCHERING-PLOUGH CORP.; SMITHKLINE BEECHAM CORP.; TAP PHARMACEUTICAL PRODUCTS, INC.; WYETH, INC.; WYETH PHARMACEUTICALS, INC.; ZENECA, INC.; ZLB BEHRING LLC; and DOES 1 through 100, inclusive,<br><br>Defendants. | No. C 05-03740 WHA<br><br>**ORDER DISMISSING SECOND AMENDED COMPLAINT** |

**INTRODUCTION**

In this action alleging overpricing of medicine, defendants move to dismiss the second amended complaint. The motion is **GRANTED**.

**STATEMENT**

The Public Health Service Act of 1992 established a drug discount program called the Section 340B program. 42 U.S.C. 256b. The 340B program requires participating pharmaceutical manufacturers to provide statutorily defined discounts on outpatient drugs to qualified hospitals and clinics. Manufacturers are required to participate in the 340B program

as a condition of having drug charges reimbursed by Medicaid. Manufacturers working through Medicaid must enter into a Pharmaceutical Pricing Agreement with the Secretary of the Department of Health and Human Services. That agreement limits the prices drug makers may charge. The 340B program is overseen by the Health Resources and Services Administration ("HRSA"), an agency within the department. Immediate responsibility for oversight of the 340B program resides in HRSA's Office of Pharmacy Affairs.

This lawsuit was evidently provoked by a series of federal reports raising concerns about overcharges. In March 2003, the Office of Inspector General of the Department of Health and Human Services issued a report entitled "Pharmaceutical Manufacturers Overcharged 340B-Covered Entities." The report stated that five pharmaceutical manufacturers had overcharged various 340B entities during the one-year period ending September 30, 1999. The OIG issued another report in June 2004 entitled "Appropriateness of 340B Drug Prices." It examined the prices paid by various 340B entities in September 2002. It found that 340B entities overpaid and did not receive the correct discount for thirty-one percent of sampled drug purchases. The report estimated that 340B entities overpaid $41.1 million for the sample month. No specific manufacturers, 340B entities or drug prices were identified in the report. On October 21, 2004, the OIG withdrew the June 2004 report after finding problems with data used to conclude that entities were overcharged. The OIG expects to release a new report to determine whether 340B entities paid the appropriate price.

Santa Clara County sued defendants in Alameda County Superior Court, claiming they had overcharged for drugs. After removal to federal court, a motion for remand was denied. Plaintiff's first amended complaint was dismissed entirely with leave to amend. The second amended complaint is the target of the instant motion. It reiterates claims in the first amended complaint, namely violations of California's Unfair Competition Law and False Claims Act and for an accounting. It adds claims for breach of contract, for breach of the covenant of good faith and fair dealing, for negligence and in quantum meruit.

2

# ANALYSIS[1]

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957). On the other hand, "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996).

"[T]he Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley*, 355 U.S. at 47 (quoting Rule 8(a)(2)). Allegations of fraud, however, must meet the heightened pleading standards of FRCP 9(b). These require allegations of particular facts going to the circumstances of the fraud, including time, place, persons, statements made and an explanation of how or why such statements are false or misleading. *In re Glenfed, Inc. Sec. Litig.*, 42 F.3d 1541, 1547–48 n.7 (9th Cir. 1994) (en banc).

### 1. JUDICIAL NOTICE.

Defendants ask for judicial notice of various government and court documents, an annual report of GlaxoSmithKline plc and news articles from *The Wall Street Journal* and the Associated Press. Plaintiff do not oppose the requests. Judicial notice is proper when the matter of which notice is taken is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FRE 201(b), (b)(2). The materials of which defendants ask the Court to take notice meet these criteria. The Court therefore takes judicial notice of the existence and contents of all the materials listed in the requests.

---

[1] This order addresses only the motions to dismiss brought by all defendants. Two other motions to dismiss are either moot or were withdrawn.

3

**2.  UNFAIR COMPETITION CLAIM.**

The claim in the first amended complaint for violation of California Business and Professions Code 17200, the Unfair Competition Law, was dismissed because counties do not have standing to bring such actions in the circumstances of the instant action. Santa Clara argues that its new UCL claim nevertheless must be sustained because it "includes additional named plaintiffs, namely, the Section 340B entities . . ." (Opp. 8).

The body of the second amended complaint includes a paragraph with the headings "Parties," and then "Plaintiffs." It identifies the plaintiffs as follows (Second Am. Compl. (hereinafter "Compl.") ¶ 10):

> Plaintiffs include the County of Santa Clara, a public entity which owns, operates and provides health services by and through the Santa Clara Valley Health and Hospital System ("SCVHHS"), and its various clinics and subdivisions, including the following: Santa Clara Valley Medical Center ("SCVMC"), Surgical Daycare 5 West, Electro Encephalography, Oncology Clinic, Moorpark Clinic Pharmacy, Silver Creek Clinic Pharmacy, Out Patient Clinic Pharmacy, East Valley Clinic Pharmacy, South Valley Clinic Pharmacy, Valley Health Center Clinic Pharmacy, Chronic Peritoneal Dialysis – Home, Renal Dialysis, Emergency Department, East Valley Clinic, South Valley Clinic, Silver Creek Clinic, Valley Health Center Administration, MPC Primary Care, Valley Health Center Cardiology Clinic, MPC Diabetes and Metabolism Center, Valley Health Center Dermatology/Allergy, Mobile Medical Services, Valley Health Center Pediatrics, Valley Health Center Rheumatology, Valley Health Center Bascom Urgent Care, Valley Health Center OB/GYN, MPC Employee Health/Occupational Medicine, Tully Clinic, OPD-Urgent Care Clinic, Pep Lab, Fair Oaks Community Clinic, Nephrology Clinic, OPD ENT & Eye, OPD Medical Speciality, OPD Surgery, Chaboya Dental Services, OPD Ortho Clinic, MPC Rehab Clinic, Tully Clinic Pharmacy, Homeless Healthcare, In-Service Education – Nursing, Office of Disaster Medical Supplies . . . .[2]

This description is ambiguous. To clear it up, the Court asked for clarifying declarations from each entity named in paragraph ten. Instead of unequivocally saying whether they had brought suit as parties separate from the county, each entity responded by submitting identically cagey statements through the same county health official.

---

[2] The caption of the complaint identifies only the county as plaintiff. The caption, however, is only "the handle to identify" the lawsuit. The identity of defendants normally is determined by reference to "the allegations in the body of the complaint and not upon [their] inclusion in the caption." *Hoffman v. Halden*, 268 F.2d 280 303–04 (9th Cir. 1959). There is no reason not to extend this rule to govern the identity of plaintiffs.

4

The complaint could be read as stating that the plaintiff is the "County . . . which provides health services . . . through the Santa Clara Valley Health and Hospital System[] and its various clinics and subdivisions." That reading views this as a single-plaintiff complaint. The description alternatively could be interpreted to state that the "Plaintiffs . . . [are] the County . . . and its various clinics and subdivisions." That construction contemplates multiple plaintiffs.

This much seems clear: the health-care providers all are owned and operated by the county (Compl. ¶ 10). The Santa Clara Valley Health and Hospital System is merely an agency of the county. The Medical Center is, in turn, a department within the Hospital System. The Medical Center and the Hospital System are controlled by the county executive, who in turn is appointed and can be removed by the county board of supervisors. County of Santa Clara, Cal., Code §§ A18-1, A18-33 (2005); County Charter § 301(c).

Furthermore, the Medical Center and Hospital System are not authorized by state law to bring civil actions. County ordinances also prevent them from taking legal action on their own. The legal officer for the Medical Center and the Hospital System is the county counsel; they may not employ or consult with any outside attorney unless the county counsel agrees. County Code § A22-16. The county counsel, in turn, is chosen and can be removed by the county board of supervisors. County Charter § 301(c). In short, the Medical Center, Hospital System and apparently all the health providers named in paragraph ten of the complaint are mere alter egos of the county without the capacity to bring suit on their own.

At the hearing, plaintiff's counsel acknowledged the basics of the relationship between the county and the medical groups named in the complaint. He stated that the Hospital System was a county agency, the plaintiff entities were subunits of it, that the Hospital System cannot sue on its own and that it will be bound by any judgment in this action.

As held in the earlier order, counties cannot sue for violations of Section 17200 in this type of case. Entities controlled and owned by the county that have no capacity to sue on their own therefore also cannot bring Section 17200 claims. Allowing them to do so would merely

5

permit counties to do by subterfuge what they are barred from doing directly. For this reason, none of the possible plaintiff entities have standing to maintain the UCL claim.

### 3. FALSE CLAIMS ACT CLAIM.

"California's False Claims Act . . . is patterned largely on [the federal False Claims Act]." *California ex rel. Bowen v. Bank of Am. Corp.*, 126 Cal. App. 4th 225, 236 (Cal. Ct. App. 2005). "Complaints brought under the [federal False Claims Act] must fulfill the requirements of Rule 9(b) . . . ." *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001). Absent exceptional circumstances, therefore, a claim under the California False Claims Act will be treated as one for fraud and must satisfy the pleading standards of FRCP 9(b) when brought in federal court. Plaintiff here explicitly alleges that "[d]efendants *fraudulently* concealed and failed to disclose the facts that they charged plaintiffs more than the best price" (Compl. ¶ 54) (emphasis added). Plaintiff does not concede directly that its False Claims Act allegations sound in fraud but it tacitly accepts defendants' contention that it must satisfy the heightened pleading requirements. Furthermore, plaintiff does not allege any facts to suggest that defendants submitted false claims unwittingly or negligently. For these reasons, plaintiff's False Claims Act allegations must meet the requirements of FRCP 9(b).

FRCP 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

> Rule 9(b) serves not only to give notice to defendants of the specific fraudulent conduct against which they must defend, but also to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect [defendants] from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis.

*Bly-Magee*, 236 F.3d at 1018 (citation omitted).

"Rule 9(b) may be relaxed to permit discovery in a limited class of corporate fraud cases where the evidence of fraud is within a defendant's exclusive possession." *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1052 (9th Cir. 2001). "In such cases, the particularity requirement may be satisfied if the allegations are accompanied by a statement

6

of the facts upon which the belief is founded." *Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1439 (9th Cir. 1987) (citation omitted).

Although drug manufacturers are required to provide their pricing information to the Department of Health and Human Services, confidentiality provisions prevent the Secretary from disclosing this pricing information. 42 U.S.C. 1396r-8(b)(3)(D). To be sure, there is a process to obtain *certain* pricing information. The OIG's October 2005 report discussed a survey of 340B entities and the process of obtaining pricing information.

> Entities may submit written requests to HRSA for 340B price approximations, but survey respondents viewed this process as cumbersome and inefficient. HRSA staff confirmed that they are only able to review price requests limited to 10 products at a time due to staffing limitations. Further, due to the confidentiality provisions, HRSA can only provide a general indication to the entity on whether the price is over the ceiling. In other words, if an entity's reported price exceeds the ceiling price, HRSA can inform the entity of the overcharge, but not the extent of the overcharge.

OIG, Dep't of Health & Human Services, No. OEI-05-02-00072, Deficiencies in the Oversight of the 340B Drug Pricing Program at 18 (2005).

The information obtained through this process is of limited value. *First*, the price requests are limited to ten products at a time. Here, plaintiff's list of purchased drugs is well in excess of ten different drugs. *Second*, plaintiff would not know the extent, if any, of overcharges. *Third*, plaintiff has reason to question the validity of the data that underlies HRSA's price calculations. For example, the OIG's October 2005 report found "systematic problems with the accuracy and reliability of the Government's record of 340B ceiling prices." Therefore, this order rejects the notion that this avenue allowed plaintiff to gather facts of the particularity normally required under Rule 9(b).

Nonetheless, the question remains whether plaintiff's "allegations are accompanied by a statement of the facts upon which the belief is founded." Wool, 818 F.2d at 1439. It is upon this issue that the claim founders. Plaintiff has not submitted any actual invoices, although the second amended complaint lists the names, quantities and prices of drugs purchased during a sample three-month period. The list identifies the vendor, but does not indicate which 340B entity purchased the drugs.

7

As the Ninth Circuit has explained:

> The time, place, and content of an alleged misrepresentation may identify the statement . . . complained of, but these circumstances do not 'constitute' fraud. The statement in question must be false to be fraudulent. Accordingly, our cases have consistently required that the circumstances constituting falseness be set forth.

*In re Glenfed*, 42 F.3d at 1548.

Plaintiff points to five items upon which it founds its belief that the claims are false. These five items are: (1) OIG's March 2003 report, "Pharmaceutical Manufacturers Overcharged 340B-Covered Entities"; (2) OIG's June 2004 report, "Appropriateness of 340B Drug Prices"; (3) OIG's October 2005 report, "Deficiencies in the Oversight of the 340B Drug Pricing Program"; (4) a letter from the chairman of the Senate Finance Committee to HRSA; and (5) allegations that certain defendants entered into three agreements to settle claims that they violated the Medicaid Drug Rebate statute.

None of the items provides a reasonable basis for inferring that any *particular* defendant engaged in the fraud alleged here. The OIG's March 2003 report examined sales from five manufacturers for eleven prescription drugs. The report estimated that the five manufacturers overcharged 340B entities $6.1 million for sales occurring during the one-year period ending September 30, 1999. Plaintiff states that defendants Aventis, Bristol-Myers, SmithKline Beecham and TAP were the manufacturers in the March 2003 report. The report did not identify the manufacturers, the eleven prescription drugs or the 340B entities. It is unclear what basis plaintiff has for asserting that those particular companies were the overcharging manufacturers. Moreover, plaintiff did not join the 340B program until 2001, *after* the period for which the OIG based its 2003 report. The June 2004 report examined the prices charged to 37 health-care providers. The report concluded that 36 of them did not receive the correct discount on a third of their sampled drug purchases in September 2002. Again, no manufacturer, drug or 340B entity was identified. Significantly, the OIG withdrew the 2004 report that October. The OIG cited problems with the data it used to calculate the ceiling price. The October 2005 report did not address the issue of any overcharges to 340B entities. Instead, it examined HRSA's ability to ensure that 340B entities paid at or below the

8

statutorily established ceiling price. The Senate Finance Committee's letter to HRSA added no new specific facts. The letter requested a status report on HRSA's progress in improving the 340B program.

Finally, plaintiff points to the outcomes of the Medicaid Drug Rebate actions taken against certain defendants for "best price" violations with respect to Medicaid. Plaintiff claims that these outcomes indicate an admission to overcharging for drugs. Plaintiff states that (Opp. 5–6):

> [AstraZeneca] pled guilty and agreed to pay $355 million in fines for violating the best price requirements with respect to the sale of Zoladex; [Pfizer] agreed to pay $9 million to settle allegations that it violated the Medicaid Rebate Program; and [TAP] agreed to pay $875 million in fines, of which $559,483,560 was attributed to violation of best price reporting. [T]he County of Santa Clara and the 340B hospitals and clinics purchased drugs from these defendants and were therefore overcharged in violation of Section 340B.

The second amended complaint also notes that with respect to the Medicaid Drug Rebate Statute, "Schering-Plough did not report . . . the best price as required" (Compl. ¶ 66). To be sure, there is a link between the "best price" as used in determining the Medicaid rebate amount and the 340B ceiling price. Consequently, any error in "best price" reporting potentially could lead to an increase in prices charged to 340B entities.

There are three problems with plaintiff's argument. *First*, the complaint does not make clear the manner in which the Medicaid "best price" reporting was improper. Untimely reporting of the "best price" is one way of violating the rules without actually reporting false figures. 42 U.S.C. 1396r-8(b)(3)(C). *Second*, it is unclear whether these Medicaid actions involved events which were within the statutory limitations period of the complaint. *Third*, Santa Clara did not begin participation in the 340B program until 2001. Office of Pharmacy Affairs, Covered Entity database, *at* http://opanet.hrsa.gov/opa/CE/CEExtract.aspx (last viewed May 10, 2006). The complaint does not allege on what dates the "best price" reporting violations occurred. They could have occurred before plaintiff joined the 340B program. *Fourth*, these Medicaid violations cannot be imputed to all defendants.

9

1    The decisions cited by plaintiff are distinguishable from the facts of this action.  In *Celador International Ltd. v. The Walt Disney Co.*, 347 F. Supp. 2d 846, 855–56 (C.D. Cal. 2004), the court found that under a relaxed pleading standard the plaintiffs sufficiently stated a basis for their allegations.  The plaintiffs specifically identified each defendant and identified its specific role in the alleged fraud.  Here, plaintiff's statement of facts is based largely on government reports that never identified the manufacturer, drug or 340B entity.  Additionally, one report was withdrawn while the other examined sales prior to plaintiff's entry into the 340B program.

Plaintiff cites *Deutsch v. Flannery*, 823 F.2d 1361 (9th Cir. 1987).  The plaintiff in *Deutsch* claimed that directors of a company schemed to depress the valuation of their company.  In return, they were promised management positions in a new company.  The complaint alleged fraud regarding a tender-offer document given by the directors to the shareholders.  The plaintiff claimed that the document purposely failed to disclose the company's true value.  The allegations included one that the company sold land carried on its books at $270,000 for $9,397,000.  Another claimed that the company could have paid dividends but did not, as a way to suppress its market value.  The facts pleaded in *Deutsch* were more specific than those here.  There, the "defendants received precise statements of what they allegedly failed to disclose."  *Id*. at 1366.

Plaintiff also cites *Wool*, 818 F.2d 1433.  After finding that a relaxed FRCP 9(b) standard was warranted, *Wool* held that:

> [T]he paragraphs alleging misleading statements, misrepresentations, and specific acts of fraud are very precise.  Each alleged misstatement is identified by content, date, and the document or announcement in which it appeared.  The complaint specified the exact dollar amount of each alleged overstatement, and the manner in which such representations were false and misleading.

*Id*. at 1439–40.

Not so here.  The complaint presents vague allegations that do not specify the content or date of alleged misstatements, the document in which they appeared or the amount of the

10

overcharge. The False Claims Act allegations therefore are dismissed for failure to comply with FRCP 9(b).

### 4. CONTRACT AND COVENANT-OF-GOOD-FAITH CLAIMS.

Plaintiff claims that it has contract rights as a third-party beneficiary of the Pharmaceutical Pricing Agreements. It alleges that these agreements exist between the Secretary and all manufacturer defendants individually. Plaintiff claims that it was damaged by defendants' breach of the Agreements (Compl. ¶¶ 102–104). Defendants seek dismissal on the ground that plaintiff is not a third-party beneficiary (Br. 9–10).

The Agreements require that they be construed under federal common law (Agreement § VII(g)). Under federal law, an entity may sue on a contract to which it is not a party if (1) the signatories intended it to benefit directly, *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 307–08 (1927), and (2) intended it to have the right to sue for performance.

> The intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended by the parties to benefit from the contract. . . . Parties that benefit from a government contract are generally assumed to be incidental beneficiaries, and may not enforce the contract absent a *clear intent* to the contrary.

*Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1211 (9th Cir. 1999) (internal quotations and citations omitted) (emphasis added).

In addition to *Klamath*, there are two other main Ninth Circuit decisions governing third-party benefits under federal contracts. In each, the court emphasized that it would not grant third-party standing absent a "clear intent" to grant it. *Orff v. United States*, 358 F.3d 1137, 1145, 1147, n.5 (9th Cir. 2004); *Smith v. Cent. Ariz. Water Conservation Dist.*, 418 F.3d 1028, 1035–38 (9th Cir. 2005). In a fourth decision, there is no mention of the "clear intent" requirement. *Tyler v. Cuomo*, 236 F.3d 1124 (9th Cir. 2000). In *Tyler*, the court held that homeowners who opposed a low-income housing project in San Francisco had third-party beneficiary status under a contract between the city and the Department of Housing and Urban Development. The contract provided that if a "member of the public" makes a written complaint, "the City shall take the objection into account and consult as needed with the objecting party." The court held that this provision was enough to allow the homeowners'

11

contract claim to go forward. *Id.* at 1134–35. In none of the four decisions did the Ninth Circuit go beyond the four corners of the contract to find the parties' intent.

We must decide whether to apply the "clear intent" requirement to the instant motion. It would be an easier decision if any of the four decisions turned on contractual provisions similar or identical to those in the Agreement. But they did not. It is significant, however, that three of the four decisions required clear intent. Although the fourth decision did not demand it openly, neither did it disavow the requirement. It simply was not mentioned. Given the weight of authority, this order applies the "clear intent" requirement.

In each Pharmaceutical Pricing Agreement, the manufacturer agreed "to charge covered entities a [discounted] price . . . ." The contract provided that the Secretary "may require the Manufacturer to reimburse the [covered] entity for discounts withheld" and requires the manufacturer to "hold audit information obtained from the covered entities confidential" (Agreement §§ II(a) IV(c), V(b)). These provisions clearly benefitted covered entities. Whether they reflected a clear intent to confer actionable rights is another matter.

The Pharmaceutical Pricing Agreements assign the role of requiring reimbursements to the Secretary. To analyze this, we borrow the statutory-construction canon "*expressio unius est exclusio alterius*" ("the inclusion of one thing suggests the exclusion of all others"). *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (describing canon). This canon suggests that when the parties gave this power to the Secretary, they intended to deny it to all others. That interpretation makes sense. If all of the more than 12,000 covered entities had standing to enforce the price controls, manufacturers would be subject to a crushing number of lawsuits, all arising out of the same contract. *See* Office of Pharmacy Affairs, Statistical Reports, Growth of 340B Covered Entity Sites *at* http://opanet.hrsa.gov/opa/Report/StatisticalReport.aspx (number of entities). It strains credulity to suggest that the manufacturers agreed to face such a threat. *See Price v. Pierce*,

12

823 F.2d 1114, 1121 (7th Cir. 1987) (barring third-party standing to applicants for housing subsidies due to their multiplicity).[3]

Other courts of appeals have assessed intent by looking to background statutes, legislative history and implementing regulations. *See, e.g.*, *Holbrook v. Pitt*, 643 F.2d 1261, 1271 (7th Cir. 1981); *Audio Odyssey, Ltd. v. United States*, 255 F.3d 512, 521 (8th Cir. 2001) (background legislation only). Those sources reinforce the conclusion that 340Bs are not third-party beneficiaries.

The legislative history of 42 U.S.C. 256b shows that its "purpose . . . is to enable . . . certain Federally-funded clinics to obtain lower prices" in the wake of a 32 percent rise in hospitals' drug costs. In recommending passage, the House Committee on Energy and Commerce intended "to enable [covered] entities to stretch scarce Federal resources as far as possible . . . ." Committee on Energy and Commerce, H.R. Rep. No. 102-384(II) at 7, 10–12 (1992). The Committee's emphasis on aiding covered entities suggests that Congress intended to benefit them directly. It does not, however, make clear that Congress wanted to confer upon them new rights to sue.

Administrative guidelines approved pursuant to 42 U.S.C. 256b provide a voluntary, informal process to resolve disputes between manufacturers and health-care providers. It includes an appeals phase. If the process finds that a manufacturer has overcharged an entity, "the manufacturer's agreement with [the Secretary] could be terminated or other actions taken . . . ." Manufacturer Audit Guidelines and Dispute Resolution Process, 61 Fed. Reg. 65,406, 65,412–13 (Dec. 12, 1996). The availability of an administrative remedy to a particular person may be proof that the government did not intend that person to have rights under the contract:

> [A regulatory emphasis on] conciliation and informal resolution of complaints suggests strongly that [Congress] did not intend a conflicting private remedy . . . to be available. To conclude otherwise would mean Congress had purposefully established an elaborate administrative

---

[3] In 1998, there were 7,000 340B entities. Growth of 340B Covered Entity Sites *at* http://opanet.hrsa.gov/opa/Report/StatisticalReport.aspx. This is still a huge number of potential parties to a contract lawsuit.

13

> procedure whose effectiveness Congress intended to be undermined willy-nilly through the institution of private lawsuits.

*D'Amato v. Wis. Gas Co.*, 760 F.2d 1474, 1481–82 (7th Cir. 1985). Although the 340B dispute-resolution process may not be "elaborate," its existence nevertheless suggests that health-care providers should not be able to bring claims under the Agreements.

Plaintiff relies on the Restatement's assertion that "[i]n some cases an overriding policy, which may be embodied in a statute, requires recognition of such a right without regard to the intention of the parties." Restatement § 302, cmt. d. *First*, an overriding policy is not enough in light of Ninth Circuit law requiring a "clear intent" in the contract. *Second*, plaintiff is not the only party situated to enforce the contract, nor is this action its only means to do so. The government may bring suit. It or plaintiff can engage in the dispute-resolution process. These facts weaken the value of a policy recognizing contract rights here. *Third*, comment d of Section 302 is trumped by Section 313 of the Restatement, which rejects third-party rights on government contracts whenever it would "contravene the policy of the law . . . prescribing remedies for [] breach." The policy of the law here is to remedy breaches via government action or the dispute-resolution process.

The above considerations militate against third-party beneficiary status to 340B entities and to plaintiff. Such rights might effectuate certain goals of the statute. There is not, however, the "clear intent" required to confer such rights. This claim cannot to go forward.

Rejection of the contract claim also ends the allegation of breach of an implied covenant of good faith and fair dealing (*see* Compl. ¶¶ 106–108). Neither the Ninth Circuit nor the Supreme Court has ever explicitly recognized that every contract formed under federal common law includes such a covenant. *Cf. Flores v. Am. Seafoods Co.*, 335 F.3d 904, 913 (9th Cir. 2003) ("[U]nder federal contract law, at least in the context of admiralty law governing a seaman's rights and remedies, each contract carries with it a duty of each party to act in good faith and to deal fairly . . . ."). If such a covenant exists, however, it must be interpreted "by reference to traditional common law principles," *Minidoka Irrigation Dist. v. Dep't of Interior*, 154 F.3d 924, 926 (9th Cir. 1998). In California, the covenant cannot form an independent basis of liability except under certain limited circumstances not present here. *Guz v. Bechtel*

14

*Nat'l Inc.*, 24 Cal.4th 317, 352 (2000) ("To the extent the implied covenant claim seeks simply to invoke terms to which the parties did agree, it is superfluous). This order applies that rule to the federal contract at issue here. Plaintiff's covenant-of-good-faith-and-fair-dealing claim cannot exist independent of the contract claim. The contract claim is out. With it goes the covenant claim.

### 5. NEGLIGENCE.

Plaintiff alleges that defendants had a duty under tort law to "use due care to ensure that they did not charge plaintiffs prices above and beyond the §340B ceiling prices mandated by law for the sale of outpatient drugs and products to §340B entities" (Compl. ¶ 97). Defendants seek dismissal of this claim on the ground that it had no such duty under tort law (Br. 12–13).

Negligence in California is actionable pursuant to the Civil Code which provides that "[e]veryone is responsible . . . for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person," Cal. Civ. Code § 1714(a). *Rowland v. Christian*, 69 Cal.2d 108, 111–13 (1968). To allege negligence properly, the plaintiff must claim that the defendant was under a legal duty to use due care. *Toomey v. S. Pac. R.R.*, 86 Cal. 374, 381 (1890).

Plaintiff claims that the duty to use due care to ensure proper drug prices arose from three sources: legislation creating the 340B program, the Agreements and a "special relationship" between defendants and 340B entities (Opp. 13–14).

The 340B statute did not create a duty for drug makers. The statute requires nothing of them. It requires the Secretary to "enter into an agreement with each manufacturer of covered drugs . . . ." The statute does not obligate the manufacturer to enter into that agreement. The manufacturer must charge the lower prices only if it executes the agreement and sells to a 340B entity. 42 U.S.C. 256b(a)(1).

Plaintiff also cannot bootstrap breach of contract into a tort. "[C]onduct amounting to a breach of contract becomes tortious only when it also violates a duty independent of the contract arising from the principles of tort law." *Erlich v. Menezes*, 21 Cal. 4th 543, 551

15

1  (1999) (internal quotation marks omitted). In this case, there is no allegation of an omission of
2  a legal duty. Plaintiff's only allegation is that defendants failed to perform the contract.
3  There are, of course, exceptions to the rule that no tort recovery can lie for breach of
4  contract. But none applies here.[4] One exception, the tort of a bad-faith breach of an insurance
5  contract, is justified based on the "special relationship" between the insured and the insurer.
6  That relationship is "characterized by elements of public interest, adhesion and fiduciary
7  responsibility." Plaintiff claims that a similar relationship exists between it and defendants.
8  However, "since . . . the insurance cases represented a major departure from traditional
9  principles of contract law, any claim for automatic extension of that exceptional approach
10 whenever certain hallmarks and similarities can be adduced in another contract setting should
11 be carefully examined." *Id.* at 552–53. Here, the relationship between plaintiff and defendants
12 does not justify bridging the divide between negligence and breach of contract.
13 Plaintiff argues that this relationship was special because "defendants are bound by
14 nothing other than their honor to provide the discounts" (Opp. 14). This argument is
15 disingenuous, since plaintiff also alleges that defendants were bound by a contract. Plaintiff
16 also relies on the foreseeability of harm if defendants negligently charged too much.
17 Foreseeability is a factor in determining whether a tort duty exists. *See Biakanja v. Irving*, 49
18 Cal.2d 647, 650 (1958). "[F]oreseeability[, however,] is not synonymous with duty; nor is it a
19 substitute." *Erlich*, 21 Cal. 4th at 552. Plaintiff was free to negotiate the terms of its sales
20 contracts with drug manufacturers. Even if there were disparities in market power between
21 plaintiff and drug manufacturers, that would not be uncommon or sufficient to create the kind
22 of special relationship that warrants extension of tort remedies. Furthermore, plaintiff's rights
23 can be protected by the federal government, which may impose sanctions for overpricing. That

---

[4] The exceptions are for breaches causing physical injury, breaches of the covenant of good faith and fair dealing in insurance contracts, wrongful discharge in violation of public policy, breach where the contract was fraudulently induced, breach accompanied by a traditional common-law tort, when "the means used to breach were tortious, involving deceit or undue coercion, and when one party intentionally breaches the contract, intending or knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages." *See Erlich*, 21 Cal 4th at 551–54. Given that plaintiff's fraud allegations are insufficient, none of these exceptions fits here.

1  possibility counsels against a finding that plaintiff was so vulnerable as to be entitled to tort

2  remedies. For these reasons, plaintiff's negligence claim is dismissed.

### 6. IN QUANTUM MERUIT.

Plaintiff brings a claim labeled "in quantum meruit." Such a claim is only viable when the plaintiff alleges that it performed a service for a defendant. *Brown v. Crown Gold Milling Co.*, 150 Cal. 376, 382 (1907); *see also* 4 B.E. Witkin, California Procedure § 527 (4th ed. 1997). Plaintiff here does not allege that it provided any service to defendants. The claim therefore is dismissed.

### 7. OTHER CLAIMS AND DEFENSES.

Plaintiff's accounting claim cannot stand independently. It is merely derivative of other claims. *See Janis v. Cal. State Lottery Comm'n*, 68 Cal. App. 4th 824, 833 (Cal. Ct. App. 1998); *see also Zuill v. Shanahan*, 80 F.3d 1366, 1369 (9th Cir. 1996) ("The remedy they seek is a declaration that they are co-owners, and none of the subsidiary remedies, for an accounting and so forth, are independent of that remedy."). There are no viable independent claims. The accounting claim therefore fails. Even if there were viable claims, the accounting claim would not survive because no action for accounting may be maintained if there is an adequate remedy at law. *Faivre v. Daley*, 93 Cal. 664, 673 (1892); *Civic W. Corp. v. Zila Indus., Inc.*, 66 Cal. App.3d 1, 14 (Cal. Ct. App. 1977). If the other claims here were viable, they would provide plaintiff with an adequate remedy at law.

Because all claims are dismissed on other grounds, there is no need to consider defendants' arguments concerning primary jurisdiction, federal preemption, real parties in interest and statues of limitations.

### CONCLUSION

For the reasons stated, defendants' motion to dismiss the second amended complaint is **GRANTED**. A prior full-scale amendment opportunity having been granted, leave to amend is not granted again. However, plaintiff(s) may have **UNTIL NOON, JUNE 2, 2006, TO FILE A MOTION SEEKING LEAVE TO AMEND**. It must be noticed on a 35-day track. Any such motion

should explain specifically the proposed amendment and why it would make a difference. Failing such, final judgment shall be entered.

**IT IS SO ORDERED.**

Dated: May 17, 2006

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE