COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
PATRICK J. COUGHLIN (111070)
JEFFREY W. LAWRENCE (166806)
AELISH M. BAIG (201279)
DANIEL J. PFEFFERBAUM (248631)
100 Pine Street, Suite 2600
San Francisco, CA  94111
Telephone:  415/288-4545
415/288-4534 (fax)
patc@csgrr.com
jlawrence@csgrr.com
abaig@csgrr.com
dpfefferbaum@csgrr.com

OFFICE OF SANTA CLARA
  COUNTY COUNSEL
ANN MILLER RAVEL (62139)
TAMARA A. LANGE (177949)
KATE L. DIDECH (235915)
70 West Hedding Street
9th Floor East Wing
San Jose, CA  95110
Telephone:  408/299-5900
408/292-7240 (fax)
Ann.Ravel@cco.sccgov.org
Tamara.Lange@cco.sccgov.org
Kate.Didech@cco.sccgov.org

HAGENS BERMAN SOBOL
  SHAPIRO LLP
STEVE W. BERMAN
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone:  206/623-7292
206/623-0594 (fax)
steve@hbsslaw.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| THE COUNTY OF SANTA CLARA, On Behalf of Itself and All Others Similarly Situated, ) ) ) | No. C-05-03740-WHA |
| ) | <u>CLASS ACTION</u> |
| Plaintiff, ) ) | THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT |
| vs. ) ) | |
| ASTRA USA, INC., et al., ) ) | <u>DEMAND FOR JURY TRIAL</u> |
| Defendants. ) ) | |

**PRELIMINARY STATEMENT**

1.       This is a class action on behalf of all §340B-covered entities ("§340B entities") in the State of California,[1] who purchased drugs pursuant to the §340B Drug Discount Program (the "§340B Program") and the Pharmaceutical Pricing Agreement ("PPA") that pharmaceutical manufacturers entered into with the United States Secretary of Health and Human Services ("HHS"), which required, *inter alia,* that manufacturers to charge a price for covered outpatient drugs that will not exceed the Average Manufacturer Price ("AMP") decreased by a rebate percentage.  This action alleges that the §340B entities were overcharged for prescription and over-the-counter drugs and pharmaceutical products ("drugs") under the §340B Program pursuant to the Public Health Service Act of 1992 (the "PHS Act"), 42 U.S.C. §256b.

2.       In 1992, through enactment of the PHS Act, 42 U.S.C. §256b, Congress established the §340B Program as a condition for participation in Medicaid.  The PHS Act requires pharmaceutical manufacturers to provide a statutorily defined discount on outpatient drugs to qualified entities, thereby allowing those healthcare providers, public hospitals, community health centers and other qualified entities to buy pharmaceuticals for their patients at a reduced rate, typically 20%-35% less than non-covered entities would pay for the same pharmaceuticals.  These participating entities ("§340B Participants") spent $3.4 billion on outpatient drugs in calendar year 2003 alone, serving the disadvantaged in need of prescription drugs.

3.       Section 340B entities have spent considerable sums for the provision of outpatient pharmaceuticals under the §340B Program.  In 2004 alone, the County of Santa Clara spent more than $30 million, funding the purchase of out-patient prescription and over-the-counter drugs on behalf of §340B Participants.  During fiscal year 2003, the County of Santa Clara spent approximately $29 million, funding the purchase of prescription and over-the-counter drugs on

---

[1]       "***Covered Entity***" means: (1) certain Public Health Service grantees, "look-alike" Federally Qualified Health Centers and disproportionate share hospitals as described in section 340B(a)(4) of the Act; and (2) in the case of a covered entity that is a distinct part of a hospital, the hospital itself shall not be considered a covered entity unless it meets the requirements of section 340B(a)(4)(L) of the Act, as determined by the Secretary.  Ex. D, §I(e), attached hereto.

behalf of §340B Participants.  For the first eight months of 2005, the County of Santa Clara expended more than $31 million for purchases of §340B pharmaceuticals and over-the-counter drugs.

4.      In March 2003, the HHS, Office of Inspector General ("OIG"), the premier healthcare finance investigatory agency in the country, issued a report entitled "Pharmaceutical Manufacturers Overcharged §340B-Covered Entities."  OIG Report No. A-06-01-00060 (the "OIG's 2003 Report"). The OIG's 2003 Report estimated that five pharmaceutical manufacturers overcharged §340B Participants $6.1 million for sales occurring during the one-year period ending September 30, 1999. This Report and all OIG Reports discussed herein are attached hereto as Exhibit E.

5.      On June 29, 2004, the OIG issued another report (OIG Report No. OEI-05-02-00070) (the "OIG's 2004 Report"), concluding that pharmaceutical manufacturers repeatedly caused participants in the §340B Program to overpay for prescription drugs.  In particular, the OIG's 2004 Report found that more than 97% of §340B Participants surveyed had paid prices for prescription drugs that exceeded the prices that may lawfully be charged to §340B Participants.  The OIG's 2004 Report further found all types of drugs for which manufacturers had overcharged §340B Participants, extrapolating from September 2002, a single month of overcharges of $41.1 million, and that §340B Participants have overpaid for prescription drugs by nearly $500 million per year.  A significant portion of these monies has been wrongfully taken and should be returned to plaintiffs to satisfy the unmet need for critical healthcare services in their communities.

6.      Under the §340B Program, §340B Participants are denied access to the prescription drug pricing data necessary to determine the lawful price they are to be charged for the prescription drugs they purchase because of the industry's long-standing insistence that all pricing information, no matter how old, is confidential and proprietary.

THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT - C-05-03740-WHA

7.    Based on the OIG's 2003 and 2004 Reports, as well as certain plea agreements involving violation of the Medicaid Best Price Reporting Requirements, plaintiffs are informed and believe that they have overpaid for prescription drugs manufactured and/or sold by defendants.

### JURISDICTION AND VENUE

8.    On December 2, 2005, this Court held it had federal question jurisdiction over plaintiff's claims.  Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) because a substantial part of the events giving rise to the claims occurred in this district.

### THE PARTIES

#### Plaintiffs

9.    (a)    The County of Santa Clara is a public entity which owns, operates and provides health services by and through the Santa Clara Valley Health and Hospital System ("SCVHHS"), and its various clinics and subdivisions, including the following: Santa Clara Valley Medical Center/outpatient pharmacy ("SCVMC"); Valley Health Center at Bascom; San Martin Clinic Pharmacy; East Valley Clinic, Valley Health Center at Tully; Moorpark Clinic; and Valley Health Center at Silvercreek, all of which purchase drugs from defendant manufacturers under the §340B Program and pursuant to the PPA.

(b)    The County of Santa Clara Ordinance Code §A18-1 describes the relationship between Santa Clara County and the Santa Clara Valley Health and Hospital System.  The Santa Clara County Ordinance Code §A18, subsections 1, 2 and 4, provide as follows:  "There is in the County the Santa Clara Valley Health and Hospital System, hereafter referred to in this chapter as the SCVHHS . . . .  There is in the SCVHHS the position of Executive Director.  The Executive Director shall be appointed by and supervised by the County Executive in accordance with the provisions of the County Charter and this Code . . . .  The Executive Director shall have administrative control over SCVHHS which includes the development and administration of the SCVHHS' budget [and] [t]he Executive Director shall be responsible for . . . the collection of all accounts within SCVHHS."

THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT - C-05-03740-WHA

(c)     Each of the clinics referenced above in paragraph 9(a) has its own separate 340B number, identifying it as an active participant in the §340B Program. Each of the clinics also has its own separate Drug Enforcement Administration number ("DEA number") which is required for any entity ordering or distributing controlled substances.

10.    (a)     The County of Santa Cruz is a public entity which owns, operates and provides health services by and through the Santa Cruz County Health Services Agency ("SCCHSA"), and its various clinics and subdivisions, including the following: SCCHSA Pharmacy; Watsonville Health Center; Homeless Persons Health Project Clinic; and the Santa Cruz Health Clinic, all of which purchase drugs from defendant manufacturers under the §340B Program and pursuant to the PPA.

(b)     The County of Santa Cruz's relationship with SCCHSA arises out of and is authorized by the Counties' obligation to provide services, including healthcare services, under the laws of the State of California, including Cal. Welf. & Inst. Code §§10000, 17000.

(c)     Each of the clinics referenced above in paragraph 10(a) and (b) has its own separate 340B number, identifying it as an active participant in the §340B Program. Each of the clinics also has its own separate DEA number which is required for any entity ordering or distributing controlled substances.

11.    (a)     The County of Riverside is a public entity which owns, operates and provides health services by and through the Riverside Department Public Health ("RDPH"), the Riverside County Regional Medical Center ("RCRMC"), and its various clinics and subdivisions, all of which purchase drugs from several of defendant manufacturers under the §340B Program and pursuant to the PPA.

(b)     The County of Riverside's relationship with the RDPH and the RCRMC arises out of and is authorized by the Counties' obligation to provide services, including healthcare services, under the laws of the State of California, including Cal. Welf. & Inst. Code §§10000, 17000.

THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT - C-05-03740-WHA

(c)   Each of the clinics referenced above in paragraph 11(a) and (b) has its own separate 340B number, identifying it as an active participant in the §340B Program.  Each of the clinics also has its own separate DEA number which is required for any entity ordering or distributing controlled substances.

12.   As a result of defendants' overcharges, §340B entities paid more than they were required under the §340B Program and suffered injury and damages thereby.  Each of the Counties described above has fiscal responsibility for all of the entities/clinics identified above, including in the case of the County of Santa Clara, SCVMC, a public disproportionate share hospital covered under the §340B Program, and for all of the pharmacies affiliated therewith.  Through the funding of these entities, the Counties provide healthcare to the indigent and disadvantaged.  Plaintiffs have expended county funds to purchase pharmaceuticals used in the outpatient context from defendants at all relevant times.  The Counties have suffered an injury in fact and lost money as a result of defendants' unlawful conduct as alleged herein.

13.   Under Cal. Welf. & Inst. Code §17000 ("Welfare Code §17000"), the Counties must provide healthcare to their residents as the "provider of last resort" or to assure that residents who cannot get care elsewhere have at least their basic healthcare needs met by the Counties.

14.   Individually and/or collectively, plaintiffs have purchased drugs from each of the defendants listed below.  Plaintiffs have purchased drugs from each of the manufacturer defendants listed below.

**Defendants**

15.   Defendant AstraZeneca Pharmaceuticals LP is a Delaware corporation, with its principal place of business located at 1800 Concord Pike, Wilmington, Delaware.  AstraZeneca Pharmaceuticals LP is owned and controlled by AstraZeneca PLC, a public limited liability company domiciled in the United Kingdom.

16.   Defendants Astra USA, Inc., Zeneca Inc., and AstraZeneca Pharmaceuticals LP are collectively referred to as "AstraZeneca."  AstraZeneca maintains research, development, and

THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT - C-05-03740-WHA

manufacturing facilities worldwide, including in the United States.  AstraZeneca reported annual sales of $16.5 billion in 2001, with an operating profit of $4.2 billion.  AstraZeneca manufactures and markets several drugs for use in the outpatient setting, including, but not limited to, Zoladex® (goserelin acetate), Nolvadex® (tamoxifen citrate), Tomudex® (ralitrexed), and Diprivian® (propofol).

17.    Defendant Aventis Pharmaceuticals Inc. ("Aventis") is a Delaware corporation with its principal place of business located at 55 Corporate Drive, Bridgewater, New Jersey.  Aventis is a wholly owned subsidiary of Aventis, S.A., a company domiciled in France.  Aventis is comprised of the U.S. commercial operations of predecessor companies Rhone-Poulenc Rorer, S.A. and Hoechst Marion Roussel, Inc. ("Hoechst").  Prior to its acquisition by Aventis, Hoechst was a Delaware corporation with its principal place of business located at 10236 Marion Park Drive, Kansas City, Missouri.  Aventis' principal business activities are the discovery, development, manufacture and sale of prescription pharmaceuticals in the areas of cardiology, oncology, infectious diseases, arthritis, allergies and respiratory disorders, diabetes and central nervous system disorders.  Aventis reported U.S. net sales of approximately $5.8 billion in 2001.  According to the Public Hospital Pharmacy Coalition, and a January 1, 2006 American Society of Health-System Pharmacists report, Aventis is one of the manufacturers that has overcharged §340B Participants identified in the OIG's 2003 Report.

18.    The drugs manufactured by Aventis, Hoechst and defendant ZLB Behring LLC (collectively, the "Aventis Group") are used in the outpatient setting and may include, but are not limited to, Anzemet® (dolasetron mesylate), Bioclate® (antihemo factor viii), Gammar® (immune globulin), Helixate® (antihemo factor viii), Humate-P® (antihemo factor viii), Mononine® (antihemo factor ix complex), Monoclate-P® (antihemo factor viii), and Taxotere® (docetaxel).

THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT - C-05-03740-WHA

19.     Defendant Bayer Corporation ("Bayer") markets and distributes some 10,000 products in the United States and California.  Bayer is headquartered in Pittsburgh, Pennsylvania. Bayer is in the business of developing, manufacturing and marketing pharmaceuticals and other products throughout the United States, including, but not limited to, Viadur® (leuprolide acetate implant), Avelox® (moxifloxacin hydrochloride), Koate®-DVI, Precose® (acarbose), Trasylol® (aprotinin), Adalat CC® (nifedipine), Cipro® (ciprofloxacin HCI), Nimotop® (nimodipine), Prolastin®, Gamimune® N, Adalat® (nifedipine), Biltricide® (praziquantel), Mycelex® (clotrimazole), Otic Domeboro® (2% acetic acid-aluminum [modified Burrow's]), DTIC-Dome® (dacarbazine), and Tridesilon® (desonide).

20.     Defendant Bristol-Myers Squibb Company ("Bristol") is headquartered at 345 Park Avenue, New York, New York.  Bristol is in the business of researching, developing, manufacturing and distributing pharmaceuticals and over-the-counter products.  Pharmaceuticals manufactured by Bristol include, but are not limited to, Abilify® (aripiprazole), Avapro® (irbesartan), Cardiolite® (kit for the preparation of Technetium Tc99m Sestamibi for injection), ConvaTec Ostomy Care, ConvaTec Wound Therapeutics, Enfamil® (infant formula), Erbitux® (Cetuixmab), Excedrin® (headache and migraine), Plavix® (ciopidogrel bisulfate), Pravachol® (pravastatin sodium tablets), Reyataz® (atazanavir sulfate), Sustiva® (efavirenz), TAXOL® (paclitaxel injection), Vides® EC (didanosine, delayed-release capsules), Zepcor® (simvastin) and Zerit® (stavudine).  According to the Public Hospital Pharmacy Coalition, and a January 1, 2006 American Society of Health-System Pharmacists report, Bristol is one of the manufacturers that has overcharged §340B Participants that is the subject of the OIG's 2003 Report.

21.     Defendant SmithKline Beecham Corporation, d/b/a GlaxoSmithKline (collectively, "Glaxo") is organized under the laws of Pennsylvania, and is located at One Franklin Plaza, Philadelphia, Pennsylvania.  Glaxo controls 45% of the AIDS (Acquired Immune Deficiency

THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT - C-05-03740-WHA

Syndrome) drug market.  Glaxo also manufactures and markets numerous prescription drugs, including, but not limited to, Augmentin® (amoxicillin/clavolanate potassium), Flonase® (fluticasome propionate), Emitrex®, Paxil® (paroxetine hydrochloride), Wellbutrin® (bupropion hydrochloride), Zantac® (ranitidine hydrochloride), Zyban Contac® (bupropion hydrycholoride), Geritol®, Nicoderm CQ®, Nytol®, Sominex®, Tagamet® (cimetidine hyrochloride), and Tums®, as well as other drugs used to treat AIDS patients in the outpatient setting.  According to the Public Hospital Pharmacy Coalition, and a January 1, 2006 American Society of Health-System Pharmacists report,  Glaxo is one of the manufacturers identified in the OIG's 2003 Report as having overcharged §340B Participants.

22.    Defendant Pfizer Inc. ("Pfizer") is a Delaware corporation with its principal place of business at 235 East 42nd Street, New York, New York.  Pfizer is one of the largest pharmaceutical companies in the United States, whether measured by number of prescriptions written, revenues, or market capitalization.  Pfizer is in the business of manufacturing and distributing prescription pharmaceuticals for use in the outpatient setting by providers nationwide.  Pharmaceuticals that are manufactured by Pfizer and used in an outpatient setting include, but are not limited to, Cerebyx® (fosphenytoin sodium injection), Dilatin® (phenytoin), Difiucan® (fluconazole), Zithromax® (azithromycin), Trovan® (trovafioxacin mesylate), and Unasyn® (ampicillin sodium/sulbactam sodium).  Pfizer is also named herein for drugs manufactured by Warner-Lambert Company which it acquired in 2000.

23.    Defendant Schering-Plough Corporation ("Schering-Plough") is a New Jersey corporation with its principal place of business located at 2000 Galloping Hill Road, Kenilworth, New Jersey.  Schering-Plough's primary business involves prescription products in core product categories,  including  allergy  and  respiratory,  anti-infective  and  anticancer,  cardiovasculars,

dermatologicals and central nervous systems and other disorders.  Schering-Plough's revenues in 2001 totaled $9.8 billion.

24.     Defendant TAP Pharmaceutical Products Inc. ("TAP"), now known as Takeda Pharmaceuticals North America, Inc., is located at One Takeda Parkway, Deerfield, Illinois.  TAP was formed in 1977 as a joint venture between Abbott Laboratories and Japanese-based Takeda Pharmaceutical Company Limited.  TAP develops, markets and sells prescription drugs that are used in the outpatient setting, including Lupron Depot® (leuprolide acetate for depot suspension) and Prevacid® (lansoprazole), which is sold alone and in dosing packages known as Prevpac® (lansoprazole, amoxicillin and clarithromycin) and Prevacid® NapraPAC™ (lansoprazole and naproxen).   According to the Public Hospital Pharmacy Coalition, TAP was one of the manufacturers identified as having overcharged §340B Participants in the OIG's 2003 Report.

25.     Defendant Wyeth, Inc. and Wyeth Pharmaceuticals, Inc. (collectively, "Wyeth") are Delaware corporations.  Wyeth Pharmaceuticals, Inc. is headquartered at 500 Arcola Road, Collegeville, Pennsylvania, and is a division of Wyeth, Inc., which is headquartered at Five Giralda Farms, Madison, New Jersey.   According to its own literature, Wyeth is a global leader in pharmaceuticals.  Wyeth is in the business of manufacturing and distributing prescription drugs that are used in outpatient settings.  The drugs manufactured by Wyeth that may be used in an outpatient setting include, but are not limited to, Effexor® (venlafaxine), Protonix® (pantoprazole sodium), Benefix® (coagalin factor IX) (recombinent), Zosyn® (piperacillin and tazobactam), Mylotarg® (gemtuzumab ozogamicin), Rapamune® (sirolimus), and Hibtiter® (dipthria CRM protein conjugate).

26.     Plaintiffs are informed and believe and thereon allege that each of the named defendants, including those defendants named as Doe defendants, acted as the agent, employee, representative partner, joint venture or co-conspirators of each of the other named defendants in the

THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT - C-05-03740-WHA

1   commission of the acts and omissions alleged herein, and acted within the course and scope of his,

2   her or its duty as such agent, employee, representative, partner, joint venture or co-conspirator.  The

3   acts of each such defendant were authorized and/or ratified by each other defendant, and together

4   constitute a single and continuing course of conduct.

5                                    **FACTUAL BACKGROUND**

6                                   **The Section 340B Program**

7            27.     In 1992, through enactment of §340B of the PHS Act, 42 U.S.C. §256b, Congress

8   established the §340B Program.  The purpose of the §340B Program was to reduce drug prices used

9

10  in the outpatient context for public hospitals, community health centers and other entities that

11  provide healthcare to the homeless, the disabled, children, and the indigent.  These providers are

12  referred to as "§340B Participants."

13           28.     To reduce prescription drug prices for §340B Participants, §340B requires

14  pharmaceutical manufacturers to ensure that §340B Participants pay no more than the "ceiling

15  price," a discounted price compared to the AMP, for any pharmaceutical product.  Congress intended

16  that savings be achieved by requiring pharmaceutical manufacturers to give §340B Participants the

17

18  "best price" for both prescription and over-the-counter drugs to help "stretch scarce Federal

19  resources as far as possible, reaching more eligible patients and providing more comprehensive

20  services."  H.R. Rep. 102-384, 102d Cong., pt. 2, at 12 (2d Sess. 1992).  The §340B Program

21  requires the establishment of a prime vendor program, under which the §340B Participants enter into

22  contracts for the distribution of covered outpatient drugs.  Manufacturers are responsible for

23

24  distribution costs whenever a §340B Participant purchases its drugs directly.

25           29.     The §340B Program has become a critical mechanism to serve the healthcare needs of

26  the disadvantaged in their communities through safety net organizations.  In calendar year 2003,

27  more than 10,500 eligible healthcare providers participated in the §340B Program and paid an

28

THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT - C-05-03740-WHA

estimated $3.4 billion for outpatient drugs.  Section 340B Participants rely on the savings promised by participation in the §340B Program to support their public service missions.

### Administration of the Section 340B Program

30.     The §340B Program is overseen by the Health Resources and Services Administration ("HRSA").  The HRSA is an agency within the HHS.  The HRSA maintains programs and services that have the responsibility for safeguarding the health and well-being of millions of Americans. Each year, over 11 million mostly low-income and uninsured patients are treated in HRSA's health centers, and over 27 million women, infants, children, and adolescents are served in its maternal and child health programs.

31.     Immediate responsibility for oversight of the §340B Program resides in the HRSA's Office of Pharmacy Affairs ("OPA").  The OPA administers the PPA signed by drug manufacturers who participate in the §340B Program pursuant to §340B.  The OPA also maintains an electronic database of §340B Participants, and assists in establishing affordable pharmacy services for new and expanding community health centers.

32.     The Centers for Medicare and Medicaid Services ("CMS"), another HHS agency, also has responsibility for administration of the §340B Program.  Specifically, pursuant to an intra-agency agreement with the HRSA, the CMS provides drug price calculations to, theoretically, the OPA enabling the OPA to monitor drug manufacturers' compliance with their obligations to ensure that §340B Participants pay best prices.

33.     The Counties bear the ultimate financial responsibility for their residents' healthcare. Under Welfare Code §17000, California counties must either be the healthcare "provider of last resort" or assure that residents who cannot get care elsewhere have, at least, their basic healthcare needs met.

THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT - C-05-03740-WHA

**Terms of Participation in the Section 340B Program and the Pharmaceutical Pricing Agreement**

34.     Section 340B requires defendants to participate in the §340B Program as a condition of having their drug charges reimbursed by the Medicaid program.  Charges for more than 15% of all prescription drugs sold in the United States are reimbursed by the Medicaid program.  All, or virtually all, pharmaceutical manufacturers participate in the §340B Program and Medicaid, including defendants named in this action.

35.     Section 340B further requires defendants to agree to be bound by the PPA in order to participate in the §340B Program.  The PPA sets forth, among other things, the terms and conditions of the defendants' participation in the §340B Program and their obligations to the §340B Participants.

36.     Under both §340B and the PPA, defendants are required to ensure that the §340B Participants, who are the beneficiaries of §340B and the PPA, pay no more for any product than the §340B ceiling price.   The §340B ceiling price is based on drug cost data generated by pharmaceutical manufacturers pursuant to the Medicaid Drug Rebate Statute, 42 U.S.C. §1396r-8, particularly the manufacturer's AMP, a term defined in 42 U.S.C. §1396r-8(k)(1), and the manufacturer's Medicaid rebate amounts based on its lowest selling price, or "best price" as defined in 42 U.S.C. §1396r-8(c)(1)(C).  Manufacturers use their ceiling price determinations to establish their §340B price lists.

37.     Under the PPA, the manufacturers also are responsible for ensuring that the prices paid for drugs by §340B Participants are at or below the §340B ceiling price, regardless of whether a §340B Participant purchases from a wholesaler or directly from the manufacturer.

38.     The PPA also imposes on manufacturers the responsibility to review each quarter the electronic database maintained by the OPA of all §340B Participants to determine which community healthcare providers are participating in the §340B Program.  This requirement underscores the duty

THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT - C-05-03740-WHA

1    pharmaceutical manufacturers have to ensure that §340B Participants pay at or below the §340B

2    ceiling price for their pharmaceutical products.

3          39.    The express and essential purpose of §340B and the PPA is to provide §340B

4    Participants with a discounted price from the AMP, known as the "ceiling" or "best" price.  The

5    ceiling price is determined in part from the best price by which the manufacturer sells the drug to

6    any private purchaser.

7

8          40.    Plaintiffs and all similarly situated counties relied on defendants' duty to comply with

9    §340B, and on their performance under the PPA, of which plaintiffs are the intended beneficiaries, to

10   ensure that the prices plaintiffs paid for drugs did not exceed the §340B ceiling prices.

11         41.    Plaintiffs believe that they have paid and continue to pay more than the §340B ceiling

12   prices for outpatient drugs manufactured and/or distributed by defendants.  The data necessary to

13   identify the overpayments for §340B drugs is under the exclusive control of defendants, including,

14   but not limited to, the data underlying the AMP, the best price and the §340B ceiling price

15   calculations.  Indeed, the OIG confirmed that participating entities cannot verify that they receive the

16   §340B ceiling price due to confidentiality provisions in the authorizing statute.

17

18                **Plaintiffs Purchase Significant Quantities of Section 340B Drugs**

19         42.    Plaintiffs have purchased thousands of covered drugs pursuant to the §340B Program

20   from defendants, including, but not limited to, purchases listed in the attached Exhibit A.  Exhibit A

21   lists the names, quantities and prices of drugs plaintiffs purchased from defendants during sample

22   three-month periods.[2]  In response to the Court's May 17, 2006 Order Dismissing Second Amended

23   Complaint, noting at page 7 that plaintiffs failed to attach the invoices and identify "which 340B

24

25   _____

26   [2]       Exhibit A includes sample pricing information for up to three months for each drug listed.
     The quantities plaintiffs purchased are not limited to those identified in Exhibit A.  Plaintiffs also
27   purchased the drugs identified in Exhibits B and C, attached hereto.

28

     THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT - C-05-03740-WHA

entity purchased the drugs," Exhibits B and C are attached hereto.  Exhibit B is comprehensive and includes the invoice date, vendor name, contract group name, AHFS (American Hospital Formulary Service) description, form, size, package quantity, strength, unit description, item description, generic name, order quantity, shipped quantity, unit price and extended price for every §340B purchase from 2001 through 2005.  Exhibit C includes all of the invoices for all plaintiffs' purchases from all defendants from 2001 through 2005.  Each invoice identifies the specific county-funded §340B entity for which the drug was purchased.  Between 2001 and 2005, plaintiffs purchased significant quantities of multiple drugs pursuant to the §340B Program, including, but not limited to, the following:

(a)     **AstraZeneca –** Accolate®, Nexium®, Prilosec®, Pulmicort Respules®, Seroquel®, Toprol-XL®, Xylocaine®, and Zomig®;

(b)     **Aventis –** Allegra®, Arava®, DDAVP®, Lantus®, Lovenox®, and Taxotere®;

(c)     **Bayer** – Ascensia®, Avelox®, Cipro®, and Precose®;

(d)     ZLB Behring LLC – Stimate®;

(e)     **Bristol** – Abilify®, Buspar®, Coumadin®, Cytoxan®, Dovonex®, Glucophage®, Kenalog®, Lac-Hydrin®, Monopril®, Nefazodone®, Plavix®, Pravachol®, Reyataz®, Sustiva®, Trazadone®, Videx®, and Zerit®;

(f)     **Glaxo** – Advair Discus®, Augmentin®, Avandia®, Avodart®, Bactroban®, Beconase®, Combivir®, Compazine®, Coreg®, Daraprim®, Dexedrine®, Epivir®, Eskalith®, Flonase®, Flovent Inhalers®, Gaviscon®, Geritol®, Hycamtin®, Imitrex®, Lamictal®, Lanoxin®, Lexiva®, Mepron®, Navelbine®, Nicoderm®, Paxil®, Retrovir®, Serevent®, Timentin®, Trizivir®, Ventolin®, Wellbutrin®, Zantac®, Ziagen®, Zofran®, and Zyban®;

(g)     **Pfizer –** Aromasin®, Bextra®, Camptosar®, Celebrex®, Cleocin®, Colestid®, Cortef®, Depo-Provera®, Depo-Testost®, Detrol®, Diflucan®, Dilantin®,

1   Gabapentin®, Lipitor®, Neurontin®, Nitrostat®, Norvasc®, Procardia®, Viagra®, Viracept®,

2   Xalatan®, Ziprasidone®, Zithromax®, Zoloft®, and Zyrtec®;

3            (h)    **Schering-Plough** – Avelox®, Cipro®, Claritin®, Lotrimin®, Nasonex®,

4   Peg-Intron®, Proventil®, Rebetol®, and Zetia®;

5            (i)    **TAP** – Lupron® and Prevacid®; and

6            (j)    **Wyeth –** Alesse®, Centrum®, Dimetapp®, Effexor® (Venlafaxine),

7   Phenergan®, Premarin®, Prempro®, Protonix®, Robitussin®, Triphasil®, and Zosyn®.

8                        **Non-Disclosure of Ceiling Price Data**

9       43.    Defendants have long asserted that their cost and pricing data, no matter how old, is

10  proprietary business information and must be kept confidential.  As a result, defendants refuse to

11  disclose their cost and pricing information to purchasers, including §340B Participants, or to the

12  prime vendor, even when the ceiling prices the purchasers are entitled to receive for the

13  manufacturers' products are expressly derived from data, including, but not limited to, the

14  

15  manufacturers' calculations of the AMP and "best" prices.

16     44.    Defendants' concealment and failure to disclose accurate cost and pricing information

17  that is the basis for their §340B ceiling prices prevented plaintiffs from filing this action earlier.

18     45.    Pursuant to the Medicaid Drug Rebate Statute, the CMS receives the pharmaceutical

19  manufacturers' AMP and "best" pricing data, but maintains the data as confidential and does not

20  disclose it to §340B Participants.  42 U.S.C. §1396r-8(b)(3)(D).

21  

22     46.    Based on the AMP and "best price" data the CMS receives, pursuant to an intra-

23  agency agreement with the HRSA, the CMS calculates §340B ceiling prices and provides them to

24  the OPA.  The OPA, however, does not have the resources to conduct audits of the manufacturers'

25  prices to ensure that drug manufacturers' charges to §340B Participants do not exceed the §340B

26  ceiling prices.  The OPA does not have the program, technology, or staff to match its ceiling price

27  data to the manufacturers' data or in any way to verify the propriety of the prices the §340B

28

Participants pay.  Defendants know, or have reason to know, that the OPA conducts inadequate or no monitoring of their §340B prices.

47.    The dispute resolution process set forth in the PPA applies "[i]f the Manufacturer believes that a covered entity has violated the prohibition against resale or transfer of covered outpatient drugs, section 340B(a)(5)(B), or the prohibition against duplicate discounts or rebates, section 340B(a)(5)(A) . . . ." It is an elective process allowing the manufacturers to seek a remedy in the event that covered entities abuse the process.  The PPA does not provide any remedy to covered entities for the manufacturers' abuses.  While the OPA may initiate a process to resolve disputes between the manufacturers and the §340B Participants, and the OPA may also terminate a drug manufacturer from the §340B Program for violation of the PPA, the OPA does not have the resources to conduct such an investigation.  To date, the OPA has never initiated the dispute resolution process or otherwise sought to invoke any of the remedies set forth in the PPA.  Neither the HRSA nor the OPA has the power or authority to impose consequences for violation of §340B on pharmaceutical manufacturers.  Neither §340B nor the PPA prevents the "covered entities" from bringing suit for §340B violations by the manufacturers.

48.    Moreover, as the Court held in the May 17, 2006 Order Dismissing Second Amended Complaint, there is no adequate process in place for obtaining defendants' confidential pricing information.  Quoting the OIG's October 2005 Report discussing the process for obtaining pricing information, the Court found at page 7 of the Order that:

> Entities may submit written requests to HRSA for 340B price approximations, but survey respondents viewed this process as cumbersome and inefficient.  HRSA staff confirmed that they are only able to review price requests limited to 10 products at a time due to staffing limitations. Further, due to the confidentiality provisions, HRSA can only provide a general indication to the entity on whether the price is over the ceiling.  In other words, if an entity's reported price exceeds the ceiling price, HRSA can inform the entity of the overcharge, but not the extent of the overcharge.

. . .

The information obtained through this process is of limited value.  **First**, the price requests are limited to ten products at a time.  Here, plaintiff's list of purchased drugs is well in excess of ten different drugs.  **Second**, plaintiff would not know the extent, if any, of overcharges.  **Third**, plaintiff has reason to question the validity of the data that underlies HRSA's price calculations.  For example, the OIG's October 2005 report found "systematic problems with the accuracy and reliability of the Government's record of 340B ceiling prices." (emphasis in original)

Thus, exhaustion of any requirement found in the PPA or under the OPA dispute resolution process is, and will continue to be, futile.

49.     Government agencies do not have the ability to effectively oversee the prime vendor program.  According to the OIG's October 2005 Report, entitled "Deficiencies in the Oversight of the §340B Drug Pricing Program," because the government does not have access to the ceiling price, it cannot give the ceiling price to the prime vendor, who then cannot perform its assigned role of negotiating discounts below the ceiling price.  Yet, the current prime vendor represents that it is indeed performing such negotiations.  As stated on its website (http://www.340bpvp.com/public/about/ (last visited Nov. 26, 2008)), the §340B Prime Vendor Program is managed by Apexus through a contract awarded by the HRSA, the federal agency within the HHS responsible for administering the §340B Program, the OPA.  As to the §340B Prime Vendor, Apexus is responsible for the negotiation of pharmaceutical pricing below the §340B price as well as improving access to affordable medications by establishing a distribution network for pharmaceuticals to covered entities.  Participation in the Prime Vendor Program under §340B is entirely voluntarily.  Section 340B entities are free to purchase drugs from wholesalers other than the prime vendor.

### The OIG Reports Reveal that Section 340B Participants Are Systemically Overpaying for Drugs

50.     In March 2003, the OIG issued a report entitled "Pharmaceutical Manufacturers Overcharged §340B-Covered Entities."  OIG's 2003 Report.  Specifically, the objectives of the Report were to determine: (1) whether pharmaceutical manufacturers sold prescription drugs to §340B entities using the correct Medicaid rebate amount (which is based on the best price); and (2)

THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT - C-05-03740-WHA

the extent of any overcharges.  The Report estimates that five pharmaceutical manufacturers (two of which have now merged) overcharged §340B Participants $6.1 million for sales occurring during the one year period ending September 30, 1999.  Those manufacturers are now conducting business as defendants here: Aventis, Bristol, Glaxo and TAP.  This report has not been withdrawn.

51.     Similarly, on June 29, 2004, the OIG issued a report entitled "Appropriateness of §340B Drug Prices."  OIG's 2004 Report.  The OIG's 2004 Report was based on an investigation and analysis of prices paid for drugs by §340B Participants in a single month, September 2002.  The OIG's 2004 Report concluded that §340B Participants were repeatedly and widely overcharged for the pharmaceutical manufacturers' products they purchased.  Specifically, for September 2002 alone, the month of the sample, the OIG's 2004 Report reported that:

- 31% of sampled drugs purchased by §340B Participants exceeded the §340B ceiling price.

- Section 340B Participants overpaid an estimated $41.1 million on drug expenditures of $269 million.

- 36 of the 37 §340B Participants whose purchases were sampled – more than 97% – paid more than the ceiling price for the prescription drugs they purchased.

- 53% of the drugs sampled exceeded the ceiling price at least once.

- Overcharges were not limited to one or a few manufacturers, but occurred in the products of many manufacturers.

52.     The overcharges identified by the OIG's 2004 Report, calculated on an annualized basis, are equal to nearly $500 million per year.  The upper range estimate in the OIG's 2004 Report indicates that overcharges may be as high as $259 million per month.  The OIG's 2004 Report concluded that "[s]uch a significant overpayment [by §340B Participants] undermines the intent of the 340B program.  The $41.1 million overcharged for this 1 month might instead be used to lower the cost of acquiring outpatient drugs so that covered entities can serve more patients and improve the quality of service."  This Report was withdrawn on October 21, 2004.

THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT - C-05-03740-WHA

53.     On June 29, 2004, the OIG issued a report entitled "Deficiencies in the 340B Drug Discount Program's Database."  OIG Report No. OEI-05-02-00071.  In that report, the OIG found that the poor quality of the OPA's drug price database prevents the OPA from effectively monitoring pharmaceutical product pricing and compliance with §340B requirements.

54.     In commenting on the database report, the HRSA concurred with the OIG's identification of deficiencies in the §340B database, but said it would be impossible for the HRSA to "commit to a timetable" to correct the deficiencies because of "budgetary limitations."

55.     As alleged above, plaintiffs are informed and believe that neither the OPA nor the HRSA has instituted that process because neither the HRSA nor any other entity has the power to impose consequences for violating the §340B Program.  Based on the OIG Reports, the HRSA's response, the OPA's lack of resources, and the OPA's failure to exercise any dispute resolution process or enforcement powers in the past, it is virtually certain that the OPA will continue to take no action to prevent future overcharges or recover for the §340B Participants for past ones. Manufacturer Audit Guidelines, 59 Fed. Reg. 30,022 (June 10, 1994).  As Senator Charles E. Grassley, the Chairman of the Senate Finance Committee, noted in a letter to the HRSA on September 1, 2005, attached as Exhibit F, and in an October 19, 2005 statement, the lack of oversight and failure to exercise control is a "systemic issue" that must be addressed.  The OPA will not institute a process to correct deficiencies in the program because the HRSA does not have authority to impose any consequences for violation of the §340B Program.  As noted by Grassley and in a January 1, 2006 American Society of Health-System Pharmacists report, entitled "Persistent Problems Plague 340B Program," the HRSA has been unsuccessful in recovering overcharges to §340B entities from Aventis, Bristol, Glaxo and TAP whose overcharges were reported by the OIG in 2003 and 2004.

THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT - C-05-03740-WHA

56.     On October 21, 2004, the OIG issued a notice relating to the OIG's June 2004 Report "Appropriateness of 340B Drug Prices," that disclosed enormous overcharges for the single, sampled month of September 2005.  On the day it was issued, in a highly unusual move, the notice was presented to the federal court in the Alabama action.  The notice represented that the OIG's 2004 Report had suddenly been "withdrawn," that the OIG was reanalyzing some of the data from the OIG's 2004 Report and that it would reissue the report with revisions (when and if it became necessary to do so).  Plaintiffs are informed and believe that the data that the OIG states it will reanalyze is not material to the OIG's 2004 Report's essential conclusions.  The notice stated that the data it was reanalyzing was put at issue by industry representatives and only "potentially" created a discrepancy that would affect only a small subset of the data.  Plaintiffs are informed and believe that even if the data the drug industry representatives have called into question is not accurate, any inaccuracy would not materially affect the conclusions of the OIG's 2004 Report.  Moreover, the October 21, 2004 notice withdrawing the OIG's 2004 Report, itself, concluded that:

> Despite our withdrawal of the Report because of problems with the underlying data, we continue to believe that there are systemic issues that lead to price discrepancies within the 340B Drug Pricing Program. ***These newly-discovered data problems do not affect the validity of three findings of the Report.  First, we found weaknesses in HRSA's oversight of the Program in that it has no process in place to confirm that §340B entities receive the ceiling price.  Second, we found that participating entities cannot independently verify that they receive the 340B ceiling price due to confidentiality provisions in the authorizing statute.  Finally, we found that pharmaceutical manufacturers' 340B ceiling price calculations are not verified against the Department's calculations of the 340B ceiling price***.  In fact, pharmaceutical manufacturers are not required to and do not report their ceiling prices to the Department . . . .

Plaintiffs are informed and believe that the OIG's unprecedented action, delivering the October 21, 2004 notice immediately to the court upon its issuance that purported to "withdraw" the OIG's 2004 Report, was a result of pressure from the pharmaceutical industry.  The October notice from the OIG delivered immediately to the court did not discuss or in any way invalidate any other reports issued by the OIG, including the OIG's 2003 Report, finding that five manufacturers who are defendants overcharged certain §340B entities approximately $6.1 million in one year.

THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT - C-05-03740-WHA

57.     In December 2005, the OIG announced that it expects to release a report in the spring of 2006 that will examine the prices charged to §340B Participants and industry overcharges.

58.     On December 15, 2005, a Congressional Subcommittee raised serious concerns over the HRSA's oversight of the §340B Program.  The hearing, held before the House Energy and Commerce Subcommittee on Oversight and Investigations, focused to a large degree on the need for transparency of the manufacturer defendants' ceiling price information and the HHS' authority to ensure compliance with the §340B Program.

**Certain Defendants' Public Admission of Violations of
Section 340B Requirements**

59.     Under the Medicaid Drug Rebate Statute, drug manufacturers are required to report their "best prices" to the federal government and to pay quarterly rebates to Medicaid to ensure that the nation's insurance program for the indigent receives the benefit of favorable drug prices offered to other large purchasers of drugs.  As a participant in the Medicaid Drug Rebate Program, Schering-Plough was required to report its "best price" for and to pay rebates on Claritin® (loratadine). Similarly, under the provisions of the PHS drug pricing programs, Schering-Plough was required to charge the PHS entities such as AIDS drug programs and community health centers a discounted price, based in part on the Medicaid price.  Schering-Plough did not report and change the best price as required.  As a result, plaintiffs did not receive the appropriate §340B price.

60.     On June 20, 2003, AstraZeneca pled guilty and agreed to pay $355 million in fines for violating the best price requirements with respect to the sale of Zoladex®, a drug used to treat prostate cancer.

61.     On October 28, 2002, Pfizer agreed to pay $9 million to settle allegations that it violated the Medicaid Drug Rebate Program.

62.     On October 3, 2001, TAP agreed to pay $875 million in fines, of which $559,483,560 was attributed to violation of best price reporting.

THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT - C-05-03740-WHA

63.     In each of the foregoing instances, plaintiffs purchased drugs from each of these defendants, and as a result of best price violations, were not charged the correct §340B ceiling price. The information necessary for plaintiffs to determine the exact amount overpaid is currently under the exclusive control of defendants.

64.     Based on the facts found and reported in the OIG Reports, the defendants' guilty pleas alleged above, Congressional suspicion of wrongdoing and other evidence that will be presented at trial, it is virtually certain that plaintiffs overpaid for drugs supplied by defendants.

### Section 340B Participants Cannot Obtain Prescription
### Drug Cost Data Without Judicial Assistance

65.     Plaintiffs do not possess and cannot without Court order obtain the information necessary to verify that the prices the §340B entities pay for prescription drugs are at or below the §340B ceiling price.  Nor can they compel the OPA to initiate action.  Plaintiffs have relied on the defendants' compliance with §340B and the PPA to ensure that they pay no more than the ceiling price for §340B purchases.  The OIG Reports, guilty pleas settlements and all other allegations set forth herein support plaintiffs' claims that defendants fraudulently and negligently concealed and failed to disclose the facts that they charged and continue to charge plaintiffs more than the ceiling price as required under 42 U.S.C. §256b(a)(1).  Plaintiffs did not and could not reasonably discover these facts until, at the earliest, the date upon which the OIG Report was issued in 2003.  Unless and until an accounting is ordered, plaintiffs will be unable to determine the amount of the alleged overcharges because the data required to do so is within the exclusive possession of defendants.

### CLASS ACTION ALLEGATIONS

66.     Plaintiffs bring this action on their own behalf and on behalf of all other similarly situated Class members, pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure.  The Class the plaintiffs seek to represent is defined as:

> All §340B participants, including California counties who fund participants in the §340B Drug Discount Program, and the §340B participants funded by them under

THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT - C-05-03740-WHA

the Public Health Service Act of 1992, who were overcharged by the defendants for drugs and other pharmaceutical products used in the outpatient context.

67.     Numerosity of the Class: The Class is composed potentially of as many as 1,400 total §340B participants and 58 counties, the joinder of which in one action would be impracticable.  The disposition of their claims through this class action will benefit both the parties and the Court.  The identities of Class members are readily ascertainable.

68.     Existence and Predominance of Common Questions of Fact and Law:  There is a well-defined community of interest in the questions of law and fact involved affecting the members of the Class.  The questions of law and fact common to the Class predominate over questions affecting only individual Class members, and include, but are not limited to, the following:

(a)     Whether defendants breached the PPA;

(b)     Whether the prices charged by defendants were the proper prices under the PPA and the statute;

(c)     Whether plaintiffs are entitled to an accounting by defendants;

(d)     Whether defendants overcharged plaintiffs for drugs used in the outpatient context;

(e)     Whether plaintiffs and the Class members are entitled to restitution of all overcharged amounts acquired by defendants;

(f)     Whether plaintiffs and the Class members are entitled to disgorgement of all profits defendants have collected as a result of the overcharges;

(g)     Whether plaintiffs and the Class members are entitled to recover compensatory and punitive damages as a result of defendants' conduct;

(h)     Whether plaintiffs and the Class members are entitled to an award of reasonable attorneys' fees, pre-judgment interest, and costs of this suit; and

(i)     Whether plaintiffs and the Class members are entitled to injunctive relief.

69.     Typicality: Plaintiffs are asserting claims that are typical of the Class, who were forced to bear overcharges by defendants, and have lost money as a result.  Plaintiffs and all Class members have similarly suffered harm arising from defendants' breach of contract, as alleged herein.

THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT - C-05-03740-WHA

70.     Adequacy: Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class members they seek to represent.  Plaintiffs will fairly and adequately represent and protect the interests of the Class because they are not antagonistic to the Class.  Plaintiffs have retained counsel who are competent and experienced in the prosecution of class action litigation.

71.     Superiority: A class action is superior to other available means for the fair and efficient adjudication of plaintiffs' and Class members' claims.  Plaintiffs and members of the Class have suffered irreparable harm as a result of defendants' unfair, unlawful, and unconscionable conduct.  Absent this action, the Class members will continue to suffer losses, the violations of law described herein will continue without remedy, and defendants will be permitted to retain the proceeds of their misdeeds.   Defendants continue to engage in the unlawful, unfair, and unconscionable conduct that is the subject of this Complaint.

## FIRST CAUSE OF ACTION

### For Breach of Contract

72.     Plaintiffs hereby repeat, reallege, and incorporate by reference the preceding paragraphs and allegations as if they were fully set forth herein.

73.     Defendants have agreed to be bound by the PPA, the contract with the Secretary of HHS setting forth the terms of participation in the §340B Program, which is attached hereto as Exhibit D.  The PPA expressly reflects the clear intent of the contracting parties to directly benefit the covered entities, including plaintiffs, by ensuring that the covered entities as beneficiaries pay no more than the statutorily defined §340B ceiling price for covered drugs.  "Pursuant to requirements under section 340B . . . the Manufacturer agrees . . . to charge covered entities a price for each unit of the drug that does not exceed an amount equal to the AMP for the covered outpatient drug reported . . . reduced by the rebate percentage."  Ex. D, §II(a).

74.     The PPA expressly identifies particularized §340B entities who are to benefit from §340B pricing.  According to the PPA, "'Covered Entity' means: (1) certain Public Health Service grantees, "look-alike" Federally Qualified Health Centers and disproportionate share hospitals as

1  described in section 340B(a)(4) of the Act . . . ."  Ex. D, §I(e).  Accordingly, these "covered

2  entities," (which include plaintiffs), are express and direct beneficiaries of the PPA.  Plaintiffs are

3  direct beneficiaries of the PPA because the PPA was drafted to confer a specific benefit on "covered

4  entities" and no one else.  The PPA also establishes certain requirements for the "covered entities"

5  with respect to record keeping, audits and not taking duplicate discounts.  Ex. D, §§III, IV(a), IV(d),

6  VII(b).  Plaintiffs therefore have a direct right to compensation for defendants' violation of the PPA.

7          75.      Under the PPA and the statute, defendants are required to charge §340B entities a

8  ceiling price that is calculated using the AMP and the Unit Rebate Amount ("URA") – statutorily

9  defined under the following formula: [(AMP) – (URA)] (multiplied by) the drug's package size =

10  ceiling price.  Manufacturers are required:

11          to charge covered entities a price for each unit of the drug that does not exceed an
            amount equal to the ***AMP for the covered outpatient drug reported*** (or which would
12          have been reported had the Manufacturer participated in the Medicaid rebate
            program) to the Secretary ***in accordance with the Manufacturer's responsibilities***
13          ***under section 1927(b)(3) of the Social Security Act***, reduced by the rebate
            percentage.
14
    Ex. D, §II(a).  Section 1927(b)(3) of the Social Security Act specifically defines what constitutes the
15
    AMP the manufacturer should be reporting; it does so by referencing section 1927(k)(1) (42 U.S.C.
16
    §1396r-8(k)(1)).  42 U.S.C. §1396r-8(b)(3)(A)(i)(I).  Section (k)(1) of the Act, in turn, provides the
17
    definition of AMP:
18
            (1) Average manufacturer price.
19
                    (A) In general.  Subject to paragraph (B), the term "average manufacturer
20          price" means, with respect to a covered outpatient drug of a manufacturer for a rebate
            period, the average price paid to the manufacturer for the drug in the United States by
21          wholesalers for drugs distributed to the retail pharmacy class of trade.

22  42 U.S.C. §1396r-8(k)(1).  Thus, both the contract and the statute require that the AMP be calculated

23  accurately in accordance with the definition in the Social Security Act so that the ceiling prices

24  charged to the §340B entities effectuates the statutory scheme.  By overcharging plaintiffs for drugs

25  purchased under the §340B Program– whether by using an AMP that was ***not*** determined in

26  accordance with the statutory and contractual definition, using a best price that was ***not*** determined

27  in accordance with the statutory and contractual definition, or otherwise, the manufacturers breached

28  both the contract and violated the statutory responsibilities that are incorporated in it.  Both the

THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT - C-05-03740-WHA

1   contract and the statutory scheme provide that the manufacturers are required to compute an AMP

2   and identify a best price in a manner that complies with the direction in the statute and requires that

3   the price charged to the §340B entities reflects that calculation.

4        76.     According to the express language of the PPA, "[t]he Agreement shall be construed in

5   accordance with Federal common law, and ambiguities shall be interpreted in the manner which best

6   effectuates the statutory scheme."  The interpretation that plaintiffs are third party beneficiaries with

7   standing to bring suit to remedy the violations alleged herein best effectuates the statutory scheme.

8   Further, as a third-party beneficiary seeking to enforce the provisions of the PPA, plaintiffs are

9   entitled to the rights necessary to effectuate that goal, including the right (provided to the Secretary

10  or his designee under the contract) of "reasonable access to records of the Manufacturer relevant to

11  the Manufacturer's compliance with the terms of the Agreement."  Ex. D, §II(e).  Any contrary

12  interpretation would allow defendants' alleged violations to go unremedied, wholly frustrating and

13  undermining the statutory scheme.

14       77.     In fact, to the extent that the reporting requirements of Section II(a) of the PPA were

15  to be interpreted to excuse defendants from reporting an AMP in accordance with the statutory

16  requirements of §1927 of the Social Security Act and §340B of the PHS Act, provisions deemed to

17  require such interpretation would be in violation of the statute and invalid under federal law.  As the

18  PPA itself provides, "Nothing in the Agreement will be construed to require or authorize the

19  commission of any act contrary to law.  If any provision of the Agreement is found to be invalid by a

20  court of law, the Agreement will be construed in all respects as if any invalid or unenforceable

21  provisions were eliminated, and without any effect on any other provision."  Ex. D, §VII(e).

22       78.     Defendants breached, and continue to breach, their contractual obligations under the

23  PPA by charging plaintiffs and the Class members more than the §340B ceiling price for covered

24  drugs.

25       79.     As the intended and direct beneficiaries of the PPA, plaintiffs and the Class members

26  are entitled to damages they sustained as a result of defendants' breach of contract, in addition to

27  reasonable costs and attorneys' fees, and other remedies as the Court may deem appropriate.

28

THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT - C-05-03740-WHA

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for judgment as follows:

A.     Requiring defendants to immediately cease their unlawful acts and practices;

B.     Requiring defendants to make full restitution of all monies wrongfully obtained;

C.     Requiring defendants to disgorge all ill-gotten revenues and/or profits;

D.     Certifying the Class specified herein and appointing plaintiffs their undersigned counsel of record to represent the Class;

E.     Requiring defendants to provide an accounting of the §340B ceiling prices as well as all data required to calculate the ceiling prices for all products in all package sizes for all months or quarters in which plaintiffs purchased such products;

F.     Granting appropriate injunctive relief to prevent the practices alleged herein from continuing;

G.     Awarding plaintiffs damages to the full extent of the law, including double or triple damages, and/or punitive damages where appropriate;

H.     Imposing a constructive trust and ordering defendants to pay restitution to plaintiffs and the Class members in the amount they have been overcharged for drugs manufactured by defendants, with interest;

I.     Awarding plaintiffs the fees and expenses incurred in this action, including reasonable allowance of fees for plaintiffs' attorneys and experts; and

J.     Granting plaintiffs such other and further relief as the Court may deem just and proper.

THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT - C-05-03740-WHA

1

**JURY DEMAND**

2

Plaintiffs hereby demand a trial by jury of all issues so triable.

3    DATED:  December 23, 2008                COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
4                                             PATRICK J. COUGHLIN
                                              JEFFREY W. LAWRENCE
5                                             AELISH M. BAIG
                                              DANIEL J. PFEFFERBAUM
6

7
                                                      /s/ Jeffrey W. Lawrence
8                                             JEFFREY W. LAWRENCE

9                                             100 Pine Street, Suite 2600
                                              San Francisco, CA  94111
10                                            Telephone:  415/288-4545
                                              415/288-4534 (fax)
11
                                              OFFICE OF SANTA CLARA
12                                              COUNTY COUNSEL
                                              ANN MILLER RAVEL
13                                            TAMARA A. LANGE
                                              KATE L. DIDECH
14                                            70 West Hedding Street
                                              9th Floor East Wing
15                                            San Jose, CA  95110
                                              Telephone:  408/299-5900
16                                            408/292-7240 (fax)

17                                            HAGENS BERMAN SOBOL SHAPIRO LLP
                                              STEVE W. BERMAN
18                                            1301 Fifth Avenue, Suite 2900
                                              Seattle, WA  98101
19                                            Telephone:  206/623-7292
                                              206/623-0594 (fax)
20
                                              Attorneys for Plaintiffs
21
     S:\CasesSD\340B Drug Discount\CTP00056436_3rd Amended CPT.doc
22

23

24

25

26

27

28

THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT - C-05-03740-WHA

1

<u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on December 23, 2008, I electronically filed the foregoing with the Clerk

3

of the Court using the CM/ECF system which will send notification of such filing to the e-mail

4

addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have

5

mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF

6

participants indicated on the attached Manual Notice List.

7

I certify under penalty of perjury under the laws of the United States of America that the

8

foregoing is true and correct.  Executed on December 23, 2008.

9

10

            /s/ Jeffrey W. Lawrence

JEFFREY W. LAWRENCE

11

COUGHLIN STOIA GELLER

12

      RUDMAN & ROBBINS LLP

100 Pine Street, 26th Floor

13

San Francisco, CA  94111

Telephone:  415/288-4545

14

415/288-4534 (fax)

15

E-mail:jlawrence@csgrr.com

16

17

18

19

20

21

22

23

24

25

26

27

28

THIRD AMENDED COMPLAINT FOR BREACH OF CONTRACT - C-05-03740-WHA

**Mailing Information for a Case 3:05-cv-03740-WHA**

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Fletcher C. Alford**
  falford@gordonrees.com

- **Jennie Lee Anderson**
  jennie@libertylaw.com

- **Aelish M. Baig**
  AelishB@lerachlaw.com,KiyokoF@lerachlaw.com

- **Philip Barilovits**
  philip.barilovits@dechert.com,jocelyn.levy@dechert.com

- **Patrick J. Coughlin**
  PatC@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Kelly Jeanne Davidson**
  kjdavidson@ober.com,pascott@ober.com

- **Halimah Dorelle DeLaine**
  halimah.delaine@dechert.com,lilli.mcbride@dechert.com

- **Alicia J. Donahue**
  adonahue@shb.com,egonsalves@shb.com,amoresco@shb.com,SFDISTRIBUTION@shb.com,rdarmstadt@shb.com

- **Matthew A. Fischer**
  matthew.fischer@sdma.com,sdmacalendaring@sdma.com,rosanna.garfias@sdma.com

- **Steven H. Frankel**
  sfrankel@sonnenschein.com,ddonner@sonnenschein.com,docket.sf@sonnenschein.com

- **Jeffrey Lawrence Handwerker**
  jeffrey_handwerker@aporter.com

- **Kirke M. Hasson**
  kirke.hasson@pillsburylaw.com,cheryl.grant@pillsburylaw.com

- **Frederick George Herold**
  Frederick.Herold@Dechert.com

- **Stephen Craig Holden**
  scholden@ober.com

- **Peter K. Huston**
  Peter.Huston@lw.com,#sfdocket@lw.com

- **Jaime L.M. Jones**
  jaime.jones@sidley.com,krockwell@sidley.com

- **Jennifer B. Jordan**
  jjordan@morganlewis.com,berobinson@morganlewis.com

- **Colin T. Kemp**
  colin.kemp@pillsburylaw.com,catherine.schmitz@pillsburylaw.com

- **Rosalie Euna Kim**
  ekim@reedsmith.com

- **Molly Moriarty Lane**
  mlane@morganlewis.com

- **Tamara Lange , Esq**
  tamara.lange@cco.sccgov.org,miguel.marquez@cco.sccgov.org,alexandra.weight@cco.sccgov.org

- **Peter Nels Larson**
  pnlarson@jonesday.com,ybennett@jonesday.com

- **Jeffrey W. Lawrence**
  jeffreyl@csgrr.com,e_file_sf@csgrr.com,e_file_sd@csgrr.com

- **Robert S. Litt**
  robert_litt@aporter.com

- **Sharon D. Mayo**
  sharon_mayo@aporter.com

- **Douglas C McDermott**
  doug@mcdermottnewman.com,eric@mcdermottnewman.com

- **Samuel Ray Miller**

srmiller@sidley.com

- **Jacqueline Eve Mottek**
  JacquiM@csgrr.com,mdevin@csgrr.com,amatney@csgrr.com,khuang@csgrr.com,e_file_sf@csgrr.com,lbowman@csgrr.com,cburke@csgrr.com,fjanecek@csgrr.com,jgilyard@csgrr.com,ccoll

- **Brien T. O'Connor**
  boconnor@ropesgray.com,cfiore@ropesgray.com

- **Richard Raskin**
  rraskin@sidley.com,brad.robertson@sidley.com,sstein@sidley.com,krockwell@sidley.com

- **Paul Jeffrey Riehle , Esq**
  paul.riehle@sdma.com,phyllis.flynn@sdma.com,jia-ming.shang@sdma.com,SDMAcalendaring@sdma.com,diana.sciamanna@sdma.com

- **Sara J. Romano**
  sromano@donahue.com

- **Ryan Sandrock**
  rsandrock@sidley.com

- **Brian W. Shaffer**
  bshaffer@morganlewis.com,mmackason@morganlewis.com

- **Cheryl Alesia Stevens**
  cheryl.stevens@cco.sccgov.org

- **Valerie Margo Wagner**
  valerie.wagner@dechert.com

- **Margo Weinstein**
  mweinstein@sonnenschein.com,NDIL_ECF@sonnenschein.com

- **Justin J. Wolosz**
  justin.wolosz@ropesgray.com

- **James M. Wood**
  jmwood@reedsmith.com,tbrennan@reedsmith.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Steven M. Edwards**
Hogan & Hartson, L.L.P.
875 Third Ave.
Suite 2600
New York, NY 10012

**James P. Muehlerger**
Shook Hardy & Bacon
2555 Grand Blvd
Kansas City, MI 64108

**Ann Miller Ravel**
Office of the County Counsel
70 West Hedding Street, 9th Floor East Wing
San Jose, CA 95110-1770

**Scott d. Stein**
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603

**Lyndon M. Tretter**
Hogan & Hartson, L.L.P.
875 Third Avenue
Suite 2600
New York, NY 10012