| | | | |
|---|---|---|---|
| 1 | PILLSBURY WINTHROP SHAW PITTMAN LLP | MORGAN, LEWIS & BOCKIUS LLP MOLLY MORIARTY LANE (SBN 149206) |
| 2 | KIRKE M. HASSON (SBN 61446) kirke.hasson@pillsburylaw.com | mlane@morganlewis.com One Market, Spear Street Tower |
| 3 | COLIN T. KEMP (SBN 215408) colin.kemp@pillsburylaw.com | San Francisco, CA 94105 Telephone: (415) 442-1000 |
| 4 | 50 Fremont Street Post Office Box 7880 | Facsimile: (415) 442-1001 |
| 5 | San Francisco, CA  94120-7880 Telephone: (415) 983-1000 | MORGAN, LEWIS & BOCKIUS LLP BRIAN W. SHAFFER (admitted *pro hac vice*) |
| 6 | Facsimile: (415) 983-1200 | bshaffer@morganlewis.com JENNIFER B. JORDAN (admitted *pro hac vice*) |
| 7 | Attorneys for Defendants MERCK & CO., INC. | jjordan@morganlewis.com 1701 Market Street |
| 8 | (f/k/a SCHERING-PLOUGH CORPORATION) | Philadelphia, PA  19103 Telephone:   (215) 963-5000 |
| 9 | | Facsimile:   (215) 963-5001 |
| 10 | *Filed on Behalf of All Defendants for Purpose of This Motion* | Attorneys for Defendant PFIZER INC. |
| 11 | | |
| 12 | | |

13          UNITED STATES DISTRICT COURT

14          NORTHERN DISTRICT OF CALIFORNIA

| | | | |
|---|---|---|---|
| 15 | _____ | ) | |
| 16 | THE COUNTY OF SANTA CLARA, on Behalf of Itself and All Others Similarly | ) ) | Case No. C 05-03740 WHA |
| 17 | Situated, | ) ) | <u>DEFENDANTS' NOTICE OF JOINT</u> <u>MOTION AND JOINT MOTION FOR</u> |
| 18 | Plaintiff, | ) ) | <u>PARTIAL JUDGMENT ON THE</u> <u>PLEADINGS OR, IN THE</u> |
| 19 | vs. | ) ) | <u>ALTERNATIVE, FOR PROTECTIVE</u> <u>ORDER; MEMORANDUM OF</u> |
| 20 | ASTRA USA, INC., et al., | ) ) | <u>POINTS AND AUTHORITIES.</u> |
| 21 | Defendants. | ) ) | Date:        March 11, 2010 Time:        8:00 a.m. |
| 22 | | ) ) | Dept.:       Courtroom 9 Judge:       The Hon. William Alsup |
| 23 | _____ | ) | |
| 24 | | | |
| 25 | | | |
| 26 | | | |
| 27 | | | |
| 28 | | | |

1

**TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION AND MOTION.................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES.........................................2

I.    INTRODUCTION.....................................................................................2

II.   BACKGROUND. ....................................................................................3

    A.    Determining AMP and BP is Complex, and it Requires the
    Manufacturer to Exercise Judgment and Discretion. ...................3

         1.    AMP and BP are the Key Components of the Medicaid
         Rebate Program, and are Also Used to Calculate 340B
         "Ceiling Prices". ...................................................................3

         2.    There is No One Right Way to Calculate AMP or BP –
         Judgment and Discretion are Involved. .................................5

    B.    Plaintiffs Are Fishing For a Claim as to the Calculation of AMP or
    BP. ...............................................................................................8

         1.    Plaintiffs' Pleading Offers Only Conclusions as to Any
         Possible Miscalculations of AMP, and is Scarcely Better as to
         Any Alleged BP Miscalculations. ........................................8

         2.    Plaintiffs Concede that They do Not Even Know *Whether*
         They Have Been Overcharged as to AMP or BP
         Determinations. ...................................................................9

    C.    This Court's December 17, 2009 Order Re-Opened Discovery Only
    for a Limited Purpose, Subject to the Court's Review and Potential
    Motions for Protective Order.......................................................10

III.  ARGUMENT. ......................................................................................13

    A.    Defendants Are Entitled To Partial Judgment On the Pleadings
    Because Plaintiffs Have Not Pled Facts Sufficient to Allege a
    Plausible Claim for Relief as to AMP or BP..............................13

         1.    *Iqbal* and *Twombly* Require Plaintiffs to Plead Facts That
         State a Claim for Relief That is Plausible on its Face. ..........13

         2.    Plaintiffs' Third Amended Complaint Fails to Meet The
         Pleading Standards Established in *Iqbal* and *Twombly* as to
         any AMP or Best Price Issue. ...............................................14

    B.    Discovery Should be Barred Because it Would be Inconsistent with
    Confidentiality Obligations under the Social Security Act. ..........18

C.   In the Alternative, the Court Should Enter a Protective Order
     Prohibiting Further Discovery Unless Plaintiffs Clarify the Nature of
     Their Claim. ................................................................................................ 19

     1.   This Court has Broad Discretion to Manage its Docket and
          Discovery. ........................................................................................ 19

     2.   Such Case Management is Particularly Appropriate to Cause
          Plaintiffs to Articulate Their Claim. ............................................... 21

D.   Even if Plaintiffs Were Entitled to Discovery, the Scope of
     Discovery Should Be Limited. .................................................................... 22

E.   Moreover, Any Discovery Should be Deferred Until the Ninth
     Circuit Rules on Defendants' Pending Petition. ......................................... 24

IV.  CONCLUSION. ..................................................................................................... 25

1

## TABLE OF AUTHORITIES

2

Page

Cases

3

*Ashcroft v. Iqbal*,
4    129 S. Ct. 1937 (2009) .......................................................................... 3, 13, 14, 17

5

*Blue Chip Stamps v. Manor Drug Stores*,
    421 U.S. 723 (1975) ............................................................................................. 17
6

*Chambers v. NASCO, Inc.*,
7    501 U.S. 32 (1991) ............................................................................................... 19

8

*Collens v. City of New York*,
    222 F.R.D. 249 (S.D.N.Y. 2004) .......................................................................... 21
9

*County of Santa Clara v. Astra USA, Inc.*,
10    588 F.3d 1237 (9th Cir. 2009) ................................................................ 11, 15, 22

11

*Crawford-El v. Britton*,
    523 U.S. 574 (1998) ............................................................................................. 20
12

*Dura Pharmaceuticals, Inc. v. Broudo*,
13    544 U.S. 336 (2005) ............................................................................................. 17

14

*Epstein v. MCA, Inc.*,
    54 F.3d 1422 (9th Cir. 1995) ............................................................................... 20
15

*Flatow v. Islamic Republic of Iran*,
16    308 F.3d 1065 (9th Cir. 2002) ............................................................................. 23

17

*Food Lion v. United Food & Commer. Workers Int'l Union*,
    103 F.3d 1007 (D.C. Cir. 1997) ..................................................................... 19, 20
18

*Goehring v. Brophy*,
19    94 F.3d 1294 (9th Cir. 1996) ............................................................................... 19

20

*Hallett v. Morgan*,
    296 F.3d 732 (9th Cir. 2002) ............................................................................... 19
21

*In re Fontaine*,
22    402 F. Supp. 1219 (E.D.N.Y. 1975) .................................................................... 20

23

*In re Recticel Foam Corp.*,
    859 F.2d 1000 (1st Cir. 1988) .............................................................................. 19
24

*Koch v. Koch Industries, Inc.*,
25    203 F.3d 1202 (10th Cir. 2000),
    *cert. denied*, 531 U.S. 926 (2000) ...................................................................... 21
26

*Link v. Wabash R.R. Co.*,
27    370 U.S. 626 (1962) ............................................................................................. 19

28

        - iii -    DEFS' JOINT MOTION FOR PARTIAL
JUDGMENT ON THE PLEADINGS OR,  PROTECTIVE
ORDER ETC.-CASE NO. C 05-03740 WHA

*Micro Motion, Inc. v. Kane Steel Co., Inc.,*
  894 F.2d 1318 (Fed. Cir. 1990) ............................................................. 20

*Poulin v. Greer,*
  18 F.3d 979 (1st Cir. 1994) .................................................................. 19

*Rojas v. Brinderson Constructors Inc.,*
  567 F. Supp. 2d 1205 (C.D. Cal. 2008) ................................................ 17

*Samsung SDI Co., Ltd. v. Matsushita Elec. Indus. Co., Ltd.,*
  No. CV 05-8493-AG(SHx), 2007 WL 4302701 (C.D. Cal. June 27,
  2007) .................................................................................................... 20

*Sirota v. Penske Truck Leasing Corp.,*
  No. C05-03296 SI, 2006 WL 708910 (N.D. Cal. March 17, 2006) ......................... 21

*Syntek Semiconductor Co., Ltd. v. Microchip Tech. Inc.,*
  307 F.3d 775 (9th Cir. 2002) ................................................................ 22

*Twombly v. Bell Atlantic Corp.,*
  550 U.S. 544 (2007) ........................................................... 3, 13, 14, 17

*United States v. Columbia Broad. System, Inc.,*
  666 F.2d 364 (9th Cir. 1982) ................................................................ 23

*United States v. Shryock,*
  342 F.3d 948 (9th Cir. 2003) ................................................................ 23

*Zubulake v. UBS Warburg LLC,*
  217 F.R.D. 309 (S.D.N.Y. 2003) ........................................................... 23

Statutes and Codes

Public Law No. 109-171 (Deficit Reduction Act of 2005),
  Volume 120, Year 2006, 109th Congress, 2nd Session, Statute 4,
  Section 6001(c)(3)(B) ............................................................................. 6

United States Code
  Title 38, section 1741 ............................................................................ 7

United States Code
  Title 42, section 1396r-8 ....................................................................... 4

United States Code
  Title 42, section 1396r-8(b) ................................................................ 18

United States Code
  Title 42, section 1396r-8(b)(3)(A) ..................................................... 18

United States Code
  Title 42, section 1396r-8(b)(3)(D) ..................................................... 18

United States Code
  Title 42, section 1396r-8(c)(1) .............................................................. 7

- iv -

United States Code
    Title 42, section 1396r-8(c)(1)(C) ................................................................ 4

United States Code
    Title 42, section 1396r-8(c)(1)(C)(ii)(I) ...................................................... 7

United States Code
    Title 42, section 1396r-8(c)(3) ................................................................... 4

United States Code
    Title 42, section 1396r-8(c)(a)(A) ............................................................. 4

United States Code
    Title 42, section 1396r-8(k)(1)(A) ............................................................ 4

United States Code
    Title 42, section 256b ................................................................................ 4

## Rules and Regulations

Code of Federal Regulations
    Title 42, section 447.504 ........................................................................... 6

Federal Regulations
    Volume 72, 39,142 (July 17, 2007) ........................................................... 6

Federal Rules of Civil Procedue
    Rule 8 ...................................................................................................... 14

Federal Rules of Civil Procedure
    Rule 12 (b)(6) ......................................................................................... 17

Federal Rules of Civil Procedure
    Rule 26 ............................................................................................... 3, 20

Federal Rules of Civil Procedure
    Rule 26(b) ............................................................................................... 23

Federal Rules of Civil Procedure
    Rule 26(b)(1) ..................................................................................... 20, 24

Federal Rules of Civil Procedure
    Rule 8(a)(2) ............................................................................................ 13

Federal Rules of Civil Procedure
    Rules 12(c) ........................................................................................... 1, 3

Federal Rules of Civil Procedure
    Rules 26(c) ......................................................................................... 1, 22

<u>Other Authorities</u>

1

2  6 James W. Moore, Moore's Federal Practice,
         Matthew Bender 3d ed., section 26.41 ..................................................... 19

3  Health and Human Services, Office of Inspector General,
         November 1992, Report A-06-91-00092 ................................................... 5

4

5  Health and Human Services, Office of Inspector General,
         October 2006, Report OEI-05-02-00072................................................. 16

6  House of Representatives Conference Report No. 104-369 (1995) .................................... 17

7  United States Code Congressional and Administrative News Service
         1995, p. 679 ..................................................................................................... 17

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFS' JOINT MOTION FOR PARTIAL
                                                                   JUDGMENT ON THE PLEADINGS OR,  PROTECTIVE
                                                                   ORDER ETC.-CASE NO. C 05-03740 WHA

1                 **NOTICE OF MOTION AND MOTION**

2 **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

3       **PLEASE TAKE NOTICE** that on March 11, 2010, at 8:00 a.m. or as soon thereafter as

4 this matter may be heard by the above-entitled Court, located at 450 Golden Gate Ave., San

5 Francisco, California, in the courtroom of the Hon. William Alsup, defendants Merck & Co.,

6 Inc. (f/k/a Schering-Plough Corporation), Astra USA, Inc., AstraZeneca Pharmaceuticals LP,

7 Aventis Pharmaceuticals Inc., Bayer Corporation, Bristol-Myers Squibb Company, SmithKline

8 Beecham Corporation d/b/a GlaxoSmithKline, Pfizer Inc., TAP Pharmaceutical Products Inc.,

9 Takeda Pharmaceuticals North America, Inc., Wyeth, Inc., Wyeth Pharmaceuticals Inc., Zeneca

10 Inc. and ZLB Behring LLC (collectively, "defendants") will bring on for hearing their motion

11 hereby made for partial judgment on the pleadings or, in the alternative, a protective order

12 prohibiting plaintiffs from conducting (or limiting) the discovery sought in their "First Joint

13 Requests for Production of Documents to All Defendants" and "First Joint Set of Interrogatories

14 to All Defendants" served January 7, 2010.

15       This motion is made pursuant to Rules 12(c) and 26(c) of the Federal Rules of Civil

16 Procedure, the Court's December 17, 2009 Order Setting Schedule for Additional Discovery (Dkt.

17 Entry No. 549) and the Court's December 17, 2009 Amended Civil Pretrial Minutes (Dkt. Entry

18 No. 553), on the grounds that defendants are entitled to partial judgment on the pleadings, that

19 plaintiffs have failed to state a claim regarding miscalculations of average manufacturer price and

20 best price (and accordingly plaintiffs must at least be ordered to amend their pleadings) or, in the

21 alternative, the Court should enter a protective order prohibiting discovery regarding information

22 underlying average manufacturer price and best price.

23       This motion is based on this notice of motion, the below memorandum of points and

24 authorities, the concurrently filed request for judicial notice and exhibits attached thereto, the

25 concurrently filed declarations of Diana Davis Bronstein (AstraZeneca), Barbara Missaggia

26

27

28

1   (Aventis), Karen McRae, (Bayer), Mark Prokop (Bayer), Katherine Larkin (BMS),[1] David Brown

2   (GSK), Ronke Ekwensi (Pfizer), Paul Le Compte (Pfizer), Glenn Weiglein (TAP), Kathleen Dynan

3   Black (Wyeth), Gerard G. Boccuti (Wyeth), Debra Kane (Merck), Paul Weissman (Merck),

4   Meredith Dwyer (Merck), Sharon Mayo (counsel to AstraZeneca), Roger Schechter (counsel to

5   Merck) and Colin T. Kemp (counsel to Merck) and any exhibits attached thereto, the pleadings and

6   all other papers on file in this action, and on such other evidence and argument as may be

7   presented to the Court on reply and at the time of hearing.

8                  **MEMORANDUM OF POINTS AND AUTHORITIES**

9   I.          INTRODUCTION.

10          This action was filed in response to a June 2004 report issued by the Office of Inspector

11  General ("OIG") of the Department of Health and Human Services ("HHS").  That report stated

12  that some 340B entities did not receive the correct 340B discount for purchases from

13  unspecified manufacturers in September 2002.  Although the OIG report was later determined to

14  be so unreliable and inaccurate that it was officially withdrawn in October 2004, plaintiffs

15  nonetheless filed this suit in August 2005 to seek, among other things, an "accounting" as to

16  whether they had been overcharged by any defendant.

17          Although this Court dismissed their action, including its "accounting" claim, the Ninth

18  Circuit and this Court subsequently allowed plaintiffs to proceed on only a breach of contract theory.

19  Plaintiffs then set about exploring whether the calculation steps between the reported Average

20  Manufacturer Prices ("AMPs") and Best Prices ("BPs"), on the one hand, and 340B ceiling prices,

21  on the other hand, were inaccurate – the subject of the 2004 OIG Report.  Extensive discovery

22  revealed that there is little merit to plaintiffs' suspicions.  For example, when Merck (then named

23  Schering-Plough Corporation) produced data relevant to this issue and the County of Santa Clara

24

25

---

26  [1]  Ms. Larkin's declaration also supports a related motion made individually by defendant
27  Bristol Myers Squibb Company ("BMS") and therefore has been filed with the Clerk's office
     today with the BMS papers.

28

1   was ordered by Judge Chen to identify any alleged overcharges by Merck, Santa Clara's analysis

2   concluded that there were no overcharges, and in fact $4.86 of undercharges.

3        Having fished in the lake and caught nothing, plaintiffs now want to fish in the ocean.

4   Though they assert that defendants might not have calculated AMP or BP correctly, they

5   concede that they have no factual basis on which they can make any such claim as to any

6   defendant, for any drug, in any quarter.  Rather, in order to determine *whether* there is any

7   factual basis for such a claim, plaintiffs argue that they need each defendant to produce all of the

8   data, internal communications, and documents bearing on how defendants calculated these

9   prices during the last decade.

10       Plaintiffs have not alleged any plausible basis for what amounts to a pure fishing expedition

11  concerning AMPs and BPs as to any of the defendants.  Defendants ask the Court to address this

12  either as a matter of pleading under Rule 12(c) and the *Twombly/Iqbal* standards that have

13  developed during the pendency of this case, or as a matter of case management and discovery

14  control under Rule 26.  Either way, the Court should require plaintiffs to articulate the alleged

15  contract breach by each defendant and to tailor their discovery to them, rather than allowing

16  plaintiffs to engage in unfocused, blunderbuss discovery.

17  II.    BACKGROUND.

         A.    Determining AMP and BP is Complex, and it Requires the Manufacturer to
18             Exercise Judgment and Discretion.

19              1.    AMP and BP are the Key Components of the Medicaid Rebate Program,
                      and are Also Used to Calculate 340B "Ceiling Prices".
20

21       On behalf of the Secretary of HHS, the United States of America filed an *amicus* brief in

22  the most recent appeal in the Ninth Circuit in this case.  ("Amicus Brief," Ex. A to Request for

23  Judicial Notice ("RJN"), filed herewith).  As that brief observes, "[t]his case concerns the

24  interplay between two Department of Health and Human Services (HHS) programs:  The

25  Medicaid Rebate program, administered by the Centers for Medicare and Medicaid (CMS); and

26  the 340B Program, administered by the Health Resources and Services Administration

27  (HRSA)."  Amicus Brief at 1.

28

1    The Secretary of HHS administers the two prescription drug programs relevant here

2    pursuant to separate statutes, regulatory agencies and contracts.  The first, and much smaller,

3    program, as to which plaintiffs assert a breach of contract, is the "340B Program," codified at

4    42 U.S.C. § 256b.  "Ceiling prices" are calculated under the 340B Program and provided to 340B

5    covered entities, but they are calculated under a formula that uses AMPs and BPs that are, in turn,

6    calculated in accordance with the requirements of a second, and much larger program, the

7    "Medicaid Rebate Program," codified at 42 U.S.C. § 1396r-8.  The Medicaid Rebate Program

8    establishes and controls the calculation of AMP and BP.  AMPs and BPs are used (along with

9    other information) in the Medicaid Program to determine the amount of Medicaid "rebates" paid

10   by drug manufacturers to the states that administer the Medicaid program.  Medicaid rebates total

11   billions of dollars annually.  *See* RJN, Ex. Q at 1.

12   AMP is currently defined by the Medicaid statute as the "average price paid to the

13   manufacturer for the drug in the United States by wholesalers for drugs distributed to the retail

14   pharmacy class of trade," 42 U.S.C. § 1396r-8(k)(1)(A).  "Best Price" is currently defined by

15   the Medicaid statute as the "lowest price available from the manufacturer during [a time period]

16   to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or

17   governmental entity within the United States," but not including prices charged to certain

18   entities.  42 U.S.C. § 1396r-8(c)(1)(C).  A third value, the "Unit Rebate Amount" ("URA"), is

19   also calculated (based on AMP and/or BP) and is used to set the amount of the Medicaid rebate

20   (per unit) to be paid by the manufacturer each quarter to the Medicaid Program.  The URA is the

21   greater of AMP minus BP or a certain percentage of AMP (depending on the type of drug),

22   sometimes adjusted for inflation.[2]  The amount of the Medicaid rebate to each state for each

23

24   —————————————

25   [2] More precisely, for multisource (*e.g.*, generic) drugs, the URA is 11% of AMP.  *See* 42 U.S.C.
     § 1396r-8(c)(3).  For single source (*e.g.*, "brand-name") drugs, the URA has two parts, a

26   "basic rebate" and an "additional rebate."  *See* 42 U.S.C. § 1396r-8(c)(1)(A) .  The basic
     rebate is the greater of 15.1% of AMP or AMP minus BP.  *See* 42 U.S.C. § 1396r-8(c)(1)(C).

27   The additional rebate is determined by a formula that adjusts for certain changes in the
     Consumer Price Index since the drug was introduced to the market.

28

1 drug, each quarter, is the URA times the number of units of the drug paid for by the state

2 Medicaid Program. *See* Amicus Brief at 3-4.

3        For the 340B Program, pharmaceutical manufacturers take the key pricing components

4 calculated under the Medicaid Program – AMP and URA (and BP, which, as explained above,

5 is sometimes used to calculate the URA) – and plug them into the 340B "ceiling price" formula.

6 That ceiling price formula is, simplifying slightly, AMP minus URA times package size. The

7 "ceiling price" is then provided to 340B covered entities. *See* Amicus Brief at 8.

8             2.    <u>There is No One Right Way to Calculate AMP or BP – Judgment and</u>
9                   <u>Discretion are Involved.</u>

10        "AMP and Best Price are terms of art when used in the Medicaid context"; their

11 calculation is "no simple task." Amicus Brief at 3.

12        AMP, though defined by statute (as explained above), has been the subject of multiple

13 reasonable interpretations.[3] Before CMS issued its first set of Regulations for AMP in 2007, it

14 was especially the case that "[t]he law and rebate agreements defined AMP in very broad terms

15 but did not provide a specific methodology . . . ."; thus, "the AMP definition [was] subject to

16 considerable interpretation." *See* RJN, Ex. N (HHS OIG, November 1992, Report A-06-91-

17 00092), at 2. Not surprisingly, the OIG found "major variations in the methods used by

18 manufacturers to determine AMP." *Id.* These occurred not through fault of the manufacturers

19 but "because HCFA [now CMS] has not provided sufficiently detailed instructions to

20 manufacturers." *Id.* at 1.

21        "Manufacturers must account for every sale that might be relevant to AMP . . ., which

22 involves sorting through voluminous amounts of data. Moreover, manufacturers must contend

23 with many difficult issues of interpretation, including questions surrounding the definition of a

24 'wholesaler,' questions about the meaning, of 'retail class of trade,' and questions about a

25 _____

26 [3] Indeed, the Medicaid Drug Rebate Agreement further expands this statutory definition (*see*
RJN, Ex. F, at § I(a)), and subsequent federal regulations (discussed below) expand it to many
27 pages of text.

28

1   variety of complex pricing arrangements."  Amicus Brief at 4-5.  On some of the resulting

2   issues, HHS guidance has evolved over the years.  This evolution includes 79 Drug

3   Manufacturer Releases, which include instruction or guidance as to the intricacies of calculating

4   AMP and BP.[4]  Still, "[t]he releases did not resolve all sources of ambiguity."  *Id.* at 5.

5          In the Deficit Reduction Act of 2005, Congress expressly delegated to HHS the authority

6   to define components of the definition of AMP and instructed CMS to "promulgate a regulation

7   that clarifies the requirements for, and manner in which, [AMPs] are determined," taking into

8   account any recommendations submitted to the Secretary by OIG.  Pub. L. No. 109-171,

9   § 6001(c)(3)(B), 120 Stat. 4 (2006).  In an effort to develop regulations, and reflecting the lack

10  of clarity of AMP, CMS asked manufacturers to provide supplementary reports of what AMP

11  would be calculated on several hypothetical bases:  excluding customary prompt pay discounts

12  extended to wholesalers; excluding those and also sales to nursing facility pharmacies;

13  excluding all of those and also sales to mail order pharmacies; etc.  *See* RJN, Ex. M (Drug

14  Manufacturer Release No. 74), at 1.

15         The Secretary published final regulations in the Federal Register concerning – among

16  other things – the calculation of AMP and BP in July 2007.  *See* 72 Fed. Reg. 39,142 (July 17,

17  2007), attached to the RJN as Ex. R.  The rule on "Determination of AMP" (42 C.F.R.

18  § 447.504) covers almost four columns of the Federal Register, with elaborate provisions about

19  information that should be included (*e.g.*, sales to other manufacturers if they do not repackage

20  under their own drug codes; sales to hospitals if the drug is used in an outpatient pharmacy,

21  unless the sales cannot be identified with adequate documentation as being used in the

22  ───────────────

23  [4]  *See, e.g.*, Drug Manufacturer Release No. 2 (impact of cumulative discounts on AMP calcu-
    lations), No. 3 ("clarification" on calculation of AMP where there is more than one package size
24  code for the same product code), No. 7 ("clarification" on how to calculate AMP for terminated
    drugs, where sales are sporadic, etc.), No. 14 (effect of administrative fees, incentives, promo-
25  tional fees and chargebacks on calculation of AMP), No. 28 (how to treat payments to Pharmacy
    Benefit Managers for AMP calculations), No. 38 (different calculations to use if AMP is
26  negative), etc.  RJN Exs. G-L.  Additional such releases are available at
    http://www.cms.hhs.gov/MedicaidDrugRebateProgram/03_DrugMfr Releases.asp.
27

28

1 outpatient pharmacy for outpatient use; etc.) and information that should be excluded (*e.g.*, sales

2 to a state home if it receives certain kinds of funding for veterans' care under 38 U.S.C. § 1741,

3 etc.).

4     Nonetheless, even today the determination of AMP requires judgment:

> [W]hen calculating AMP, manufacturers can face difficulty determining which sales [were] made to "wholesalers" for distribution to the "retail pharmacy class of trade." . . . Identifying "wholesalers" can be complicated when dealing with entities like Pharmacy Benefit Managers, or with manufacturers that "directly" sell drugs to consumers but have a contractor store and ship the products. Similarly, identifying the "retail pharmacy class of trade" can be murky when dealing with entities like mail-order pharmacies, pharmacies located in nursing homes, and pharmacies located in independent medical clinics.

9 Amicus Brief at 29-30. In such matters, the operative principle has been and today remains that,

10 in the absence of regulatory guidance, manufacturers may properly employ different

11 methodologies so long as they are not unreasonable. For example, the Medicaid Rebate

12 Agreements state:

> In the absence of specific guidance in Section 1927 of the [Social Security] Act, Federal regulations and the terms of this agreement, the Manufacturer may make reasonable assumptions in its calculations of AMP and Best Price, consistent with the intent of section 1927 of the Act, Federal regulations and the terms of this agreement.

16 *See* RJN, Ex. F, at § II(i). *Accord* Amicus Brief at 6 ("To the extent that ambiguities remain,

17 manufacturers can still rely on the provision in the rebate agreement authorizing 'reasonable

18 assumptions' where appropriate.").

19     Similarly, as noted above, Congress defined BP under the Medicaid statute, as "the lowest

20 price available from the manufacturer during the rebate period to any wholesaler, retailer,

21 provider, health maintenance organization, nonprofit entity, or governmental entity within the

22 United States," but this definition is subject to a number of exceptions and "special rules."

23 42 U.S.C. § 1396r-8(c)(1).[5] BP, like AMP, is a "term of art" whose calculation is "no simple

24 task" because, like AMP, its calculation requires manufacturers to "sort through voluminous

25 ───────────

26 [5] While one of the "special rules" requires that BP "shall be inclusive of cash discounts, free goods that are contingent on any purchase requirement, volume discounts, and rebates (other than rebates under this section)," another requires that BP "shall not take into account prices that are nominal in amount." 42 U.S.C. § 1396r-8(c)(1)(C)(ii)(I) and (III).

28

1   amounts of data" to "account for every sale that might be relevant" and to deal with "many

2   difficult issues of interpretation."  Amicus Brief at 3-4, 29-31.

3          Accordingly, when plaintiffs request such things as "[a]ll documents and

4   communications concerning, relating or referring to the transactions and prices included and

5   excluded from any of the AMP or Best Price determinations for any of your covered drugs"

6   since 2001 (Request No. 6), they are truly seeking an ocean of communications and other data

7   concerning "every sale that might be relevant" for every drug at issue.

8          B.     Plaintiffs Are Fishing For a Claim as to the Calculation of AMP or BP.

9                 1.     Plaintiffs' Pleading Offers Only Conclusions as to Any Possible
                         Miscalculations of AMP, and is Scarcely Better as to Any Alleged BP
10                       Miscalculations.

11         Plaintiffs' operative complaint, the Third Amended Complaint for Breach of Contract

12  ("TAC"), offers no specific allegations regarding alleged AMP miscalculations.  Paragraph 75

13  alleges:

14         By overcharging plaintiffs for drugs purchased under the §340B Program–
           *whether* by using an AMP that was not determined in accordance with the
15         statutory and contractual definition, using a best price that was not determined in
           accordance with the statutory and contractual definition, *or otherwise*, the
16         manufacturers breached both the contract and violated the statutory
           responsibilities that are incorporated in it.
17

18  TAC (Dkt. Entry No. 284) at 25:24-28.[6]  The TAC states that its allegations are based on two

19  reports made by the HHS Office of Inspector General, and on certain settlements.  *See* TAC ¶ 7.

20  Neither of those OIG reports identifies any mistakes in calculation of AMPs.  Indeed, as

21  plaintiffs have conceded, "[t]he OIG did not have the information for this AMP – the underlying

22  information."  Kemp Decl., ¶ 2, Ex. 1, at 26:14-15.[7]

23         As for BP, plaintiffs fail to identify any defendant that overcharged plaintiffs because of

24  a BP calculation, or how.  The 2004 OIG report to which plaintiffs advert did not concern BP

25  calculations.  The 2003 OIG report plaintiffs cite allegedly concerned only four of the

26  _____

    [6] All emphasis is added, unless otherwise noted.

27  [7] Declaration of Colin T. Kemp, filed herewith.  Declarations are cited as "[Last Name] Decl."

28

1   defendants (TAC ¶ 50), and conduct that ended in September 1999, two years before the

2   limitations period for this case.  In fact, this Court has already held that "[t]here is nothing in the

3   complaint . . . to suggest a factual basis for believing that the overcharges alleged by the OIG for

4   1998 and 1999 continued until 2001."  Dkt. Entry No. 212, at 5:12-14.  Similarly, while the

5   TAC adverts to the fact that four defendants have settled cases in the past relating to BPs (TAC

6   ¶¶ 59 - 62), plaintiffs do not seek relief in connection with those incidents, which were long ago,

7   involved specific conduct and, as plaintiffs note, have already been settled.  *See* TAC at Ex. E.[8]

8              2.      Plaintiffs Concede that They do Not Even Know *Whether* They Have
                        Been Overcharged as to AMP or BP Determinations.
9

10          Plaintiffs concede:

11          The only way we can determine how much *or whether* my client was
            overcharged was to get the information that they have already used to charge us
            the prices, see what we paid.  You know what?  *It may be, it may be that we were
12          not overcharged, but we can't know that.*

13   Kemp Decl., ¶ 2, Ex. 1, at 24:22-25:1.[9]  At the November 13, 2008 hearing on defendants' first

14   motion for protective order, plaintiffs emphasized that they needed discovery "to see *if* the price

15   that [defendants] computed and charged us was correct."  *See id.* ¶ 3, Ex. 2, at 19:7-8.

16          Plaintiffs' filings with the Court also demonstrate they are fishing for a claim.  For

17   example, in opposing defendants' first motion for a protective order, plaintiffs admitted "Santa

18   Clara County merely seeks to examine defendants' already-calculated AMP in order to

19   determine *whether* it was overcharged for the drugs it purchased under the 340B Program.  The

20   discovery is designed to determine *whether* defendants breached the PPA in their determination

21   of AMP . . . ."  Dkt. Entry No. 261, at 14:10-13.  Similarly, as recently as September 2009,

22   _____

23   [8] These settlements largely relate to alleged conduct that was prior to August 16, 2001 and
        outside the statute of limitations period.  *See* Dkt. Entry No. 496, at 2; *see, e.g.*, RJN, Ex. P;
24   Weissman Decl., ¶¶ 3-12.  Additionally, plaintiffs have clarified that they do not seek relief
        based on the particular facts that were settled in those matters.  *See* Kemp Decl., ¶ 20.  So,
25   plaintiffs are essentially asserting that because there were settlements as to certain facts that
        are *not* part of this case, there may have been violations by some or all defendants.
26

27   [9] Plaintiffs nevertheless then asserted "[w]e have evidence to believe that we were
        [overcharged]."  Kemp Decl., ¶ 2, Ex. 1, at 25:1-2.

28

1   plaintiffs admitted that they seek discovery to "determine *whether* and to what extent defendants

2   have overcharged" them.  Dkt. Entry No. 434, at 3:26-27.[10]

3         Plaintiffs' speculation that manufacturers may have reported AMPs that are too high

4   (thus potentially resulting in a higher ceiling prices for plaintiffs) is implausible because such a

5   manufacturer would be acting against its own interest in doing so.  Under the Medicaid rebate

6   program, higher AMPs often result in higher URAs (*i.e.*, when URA is calculated as a

7   percentage of AMP), which in turn will result in *higher* Medicaid rebate payments.  *See* Amicus

8   Brief at 31-32.  The increased rebates a manufacturer would pay to the states under the

9   Medicaid program as a result of "overstated" AMPs would ordinarily be many times more than

10   any additional revenue it might achieve under the far smaller 340B program by overstating

11   AMPs and thus raising the ceiling price.[11]

12         C.     <u>This Court's December 17, 2009 Order Re-Opened Discovery Only for a Limited

13              <u>Purpose, Subject to the Court's Review and Potential Motions for Protective
     Order.</u>

14         In November 2008, this Court certified for interlocutory appeal the question whether a

15   particular sentence in the Ninth Circuit's original opinion was intended to bar discovery of data

16   underlying AMP and BP.  *See* Dkt. Entry No. 269.  The Ninth Circuit accepted the appeal.

17

---

18   [10] Moreover, plaintiffs refuse to clarify the nature of their claim:  To further the Court-mandated

19   meet and confer process, in several January 2010 letters and in-person discussions defendants
     asked plaintiffs to specify the manner in which defendants allegedly miscalculated AMPs and

20   BPs.  *See* Kemp Decl., ¶ 13, Ex. 10.  Plaintiffs refused to provide any clarification and simply
     maintained that plenary discovery was necessary to see whether there had been any

21   overcharges.  *See id.*, ¶ 14, Ex. 11.

22   [11] On a related point, the Government noted, "if both 340B entities and states can bring separate
     suits over AMP calculations, there is a real possibility that manufacturers would be subject to

23   inconsistent obligations."  Amicus Brief, at 31-32.  There are also additional reasons to view
     with skepticism any conclusory assertions by plaintiffs as to BP.  At the outset of this case, in

24   arguing on a motion to remand that this action did not raise a substantial issue of federal law,
     Santa Clara asserted that, "[h]ere, in contrast, there is not even a glimmer of an allegation that

25   Medicaid has been harmed by defendants' conduct.  There is absolutely *no* basis for assuming
     that a victory in this case would impact Medicaid reimbursements."  Dkt. Entry No. 74, at

26   6:17-20 (emphasis in original)).  We likewise submit that there is not a glimmer of an
     allegation that BP was overstated.

27

28

- 10 -

1    After the parties' briefing was completed, in July 2009, the Ninth Circuit invited the views of

2    the Secretary of HHS on the following question:

3         If, notwithstanding any language in its earlier opinion, *County of Santa Clara v.*
     *Astra USA, Inc.* ("*Santa Clara I*"), 540 F.3d 1094 (9th Cir. 2008), that may have

4         suggested otherwise, the court were to hold that Plaintiff-Appellant is entitled to
     seek discovery of the data underlying the "average manufacturer price" and "best

5         price" figures Defendants-Appellees reported to the Secretary, should the court
     apply the doctrine of primary jurisdiction and direct the district court to stay this

6         action and refer the action to the Secretary?

7    Dkt. Entry No. 394, at 2.  The Secretary filed an *amicus* brief on October 27, 2009.

8         The Ninth Circuit issued its second substantive opinion in this case on December 9,

9    2009.  *See County of Santa Clara v. Astra USA, Inc.*, 588 F.3d 1237 (9th Cir. 2009) (hereinafter,

10   "*Santa Clara II*").  In *Santa Clara II*, the court deleted the sentence that was the basis for this

11   Court's protective order prohibiting discovery of information underlying manufacturers'

12   calculations of AMP and BP, but did not otherwise address the scope of discovery.  *See id.* at

13   1241 n.** (noting that this Court certified a subsequent immediate appeal "so that we could

14   clarify a statement in the opinion that had an unexpected bearing on a discovery issue").  The

15   Ninth Circuit left open "the possibility that [this Court] may decide after further factual

16   development that referral to the Secretary [under the doctrine of primary jurisdiction] is

17   appropriate." *Id.* at 1252.  The Ninth Circuit also allowed petitions for rehearing or rehearing *en*

18   *banc* (*id.* at 1241); defendants filed a petition on December 30, 2009.  *See* RJN, Ex. B.[12]

19        Fact discovery closed in this case on October 30, 2009.[13]  In light of the Ninth Circuit's

20   recent decision, however, this Court issued a new discovery order:

21        [D]iscovery will be reopened for the limited purpose of allowing plaintiffs to
     take discovery regarding the information underlying defendant manufacturers'

22        determinations of the AMP and the BP.

23        On or before January 7, 2010, plaintiffs shall serve to each defendant document
     requests and up to five interrogatories directed to the underlying data.

24

25

26   [12] As of the date of this filing, the Ninth Circuit has not addressed defendants' petition.

27   [13] *See* Dkt. Entry No. 236, at 2:5; Dkt. Entry No. 446, at 1:28.

28

- 11 -

1   Dkt. Entry No. 549, at 2:7-11.  During the December 17, 2009 hearing, the Court stated that

2   plaintiffs could issue "a reasonable number of document requests that are directed to [the]

3   underlying data," and suggested that plaintiffs consider tailoring their requests to the individual

4   defendants.  Kemp Decl., ¶ 4, Ex. 3, at 39:5-7; *see also id.* at 35:9 ("these should be reasonable

5   requests").[14]

6           On January 7, 2010, plaintiffs propounded a single set of document requests and

7   interrogatories directed to all defendants.  *See* Kemp Decl., ¶¶ 5, 6, Exs. 4, 5.  Far from being

8   reasonable in scope or directed at specific evidence of alleged overstated AMPs or BPs,

9   plaintiffs' twenty-six document requests are unbridled.  Request Nos. 3 and 6 are illustrative:

10          REQUEST 3.
            All documents concerning the following for each of the NDCs and covered drugs
11          for which you are or were responsible:  (i) the drug classification reported to
            CMS to determine whether the NDC is designated as innovator (I), single source
12          (S) or multi source (N); (ii) transactions for all sales during [January 1, 2001 to
            the date of production], including the determination of the retail class of trade,
13          price and date of sales; (iii) the sales that comprise your quarterly AMP for
            [January 1, 2001 to the date of production], including class of trade designation
14          and dates of sales, determinations and results; (iv) market date; (v) baseline
            AMP; and (vi) calculated URA – both basic and additional rebate (CPI-U
15          additional rebate).

16          REQUEST 6.
            All documents and communications concerning, relating or referring to the
17          transactions and prices included and excluded from any of the AMP or Best Price
            determinations for any of your covered drugs during [January 1, 2001 to the date
18          of production].

19  The other requests are similarly broad.  *See* Kemp Decl., ¶ 5, Ex. 4.  Since every individual sale

20  of a pharmaceutical product is either included or excluded from the AMP and BP calculations,

21  Document Request No. 6 – standing alone – seeks *all* documents about *all* sale transactions for

22  the drugs at issue since 2001.  Similarly, plaintiffs' interrogatories ask defendants to "describe

23

24

25

26  _____

27  [14] The Court also required that defendants raise all reasons for delaying discovery by
    February 4.  *See, e.g.*, Kemp Decl., ¶ 4, Ex. 3, at 42:5-14.

28

1  in complete detail" all aspects of their calculations of AMP and BP for every drug at issue, in

2  every quarter, back to 2001.  *See id.*, ¶ 6, Ex. 5.[15]

3  III.   ARGUMENT.

4       A.   Defendants Are Entitled To Partial Judgment On the Pleadings Because Plaintiffs
             Have Not Pled Facts Sufficient to Allege a Plausible Claim for Relief as to AMP
5            or BP.

6            1.   *Iqbal* and *Twombly* Require Plaintiffs to Plead Facts That State a Claim
                  for Relief That is Plausible on its Face.
7

8       Recently, in *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) and *Twombly v. Bell*

9  *Atlantic Corp.*, 550 U.S. 544 (2007), the Supreme Court addressed the requirements of Fed. R.

10  Civ. P. 8(a)(2) (which requires "a short and plain statement of the claim showing that the

11  pleader is entitled to relief").  *Iqbal* and *Twombly* make clear that more than an "unadorned, the-

12  defendant-unlawfully-harmed-me accusation" is necessary.  *Iqbal*, 129 S. Ct. at 1949.  Instead, a

13  plaintiff must proffer a complaint that contains sufficient factual matter that, when accepted as

14  true, states a "claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.[16]  In other

15  words, "factual allegations must be enough to raise a right to relief above the speculative level."

16  *Id.* at 555.

17       Here, plaintiffs assert generally that "defendants" may have miscalculated AMPs or BPs.

18  That is not enough.  As the Supreme Court elaborated in *Iqbal*, the facial plausibility standard

19  requires plaintiffs to plead specific facts implicating each named defendant:

20

21  _____

22  [15] Consistent with the Court's December 17, 2009 order, since January 7, the parties have met
     and conferred in person in good faith to attempt to resolve disputes regarding the scope of
23   discovery.  *See* Kemp Decl., ¶¶ 15-21.

     In addition to the objections to discovery set forth herein, defendants have – in their written
24   discovery responses – interposed objections to plaintiffs' discovery requests.

25  [16] Indeed, plaintiffs must plead facts that permit the Court to infer "more than a mere possibility
     of misconduct" and allow the Court to draw the reasonable inference that Defendants are
26   liable for the misconduct alleged.  *Iqbal*, 129 S. Ct. at 1950; *see also Twombly*, 550 U.S. at
     555 (complaint must provide "more than labels and conclusions" or "a formulaic recitation of
27   the elements of a cause of action").

28

1   A claim has facial plausibility when the plaintiff pleads factual content that
    allows the court to draw the reasonable inference that *the defendant* is liable for
2   the misconduct alleged.  The plausibility standard is not akin to a "probability
    requirement," but it asks for more than a sheer possibility that a defendant has
3   acted unlawfully.  Where a complaint pleads facts that are "merely consistent
    with" a defendant's liability, it "stops short of the line between possibility and
4   plausibility of 'entitlement to relief.'"

5   *Iqbal*, 129 S. Ct. at 1949 (citations omitted).  Allowing such group pleading is particularly

6   inappropriate here, where each defendant manufactures different drugs and has distinct

7   methodologies for calculating AMPs and BPs.

8       Rule 8 "contemplate[s] the statement of circumstances, occurrences, and events in

9   support of the claim presented . . . ." *Twombly*, 550 U.S. at 556 n.3 (citation omitted).  We are

10  now five years into this case; plaintiffs must provide an adequate "statement of circumstances,

11  occurrences and events" prior to proceeding with any further discovery.

12          2.   <u>Plaintiffs' Third Amended Complaint Fails to Meet The Pleading
                 Standards Established in *Iqbal* and *Twombly* as to any AMP or Best Price</u>
13          <u>Issue.</u>

14      The TAC fails to allege facts that would plausibly identify how any defendant

15  miscalculated AMP or BP.  While the TAC offers sweeping, generalized conclusory statements

16  that the defendants – a number of large pharmaceutical manufacturers – might have

17  "miscalculated" AMP or BP, no facts are pled to sustain those statements.

18      Plaintiffs are of the view that they are entitled to broad discovery to determine *whether*

19  (and, if so in any instance, to what extent) there were miscalculations of AMP or BP beginning

20  in 2001.  Yet, nowhere in the TAC do plaintiffs allege what these defendants have done in that

21  regard.  They do not identify the transactions or drugs that resulted in any such miscalculation,

22  or the theory upon which they rely.  Instead, plaintiffs hope to conduct discovery into every

23  single transaction that took place during the relevant time period to come to a theory of liability.

24  This is prohibited under Rule 8 and the governing case law.  Unless and until plaintiffs can more

25  particularly state their claim, defendants should not be made to incur further expense in

26  responding to plaintiffs' allegations or discovery requests.

27

28

1      Plaintiffs are not the only ones that have acknowledged that plaintiffs do not have any

2  specific information about whether and to what extent defendants miscalculated AMP or BP.  In

3  its *amicus* brief filed with the Ninth Circuit, the HHS Secretary – the governmental entity

4  responsible for monitoring the 340B program – agreed that plaintiffs' complaint is not

5  sufficiently particular: "plaintiff's complaint is lacking in needed detail" and "does not . . .

6  explain why any particular AMP or Best Price calculation was flawed."  Amicus Brief at 24-25.

7  Likewise, the Ninth Circuit's recent decision acknowledged that "the nature of the breaches

8  Santa Clara will seek to prove is unclear . . . ."  *Santa Clara II*, at 1252.

9      Defendants do not seek to require plaintiffs to plead evidence; rather, all we ask is that

10  plaintiffs be required to articulate, as to each defendant, the bases upon which they conclusorily

11  allege that a defendant's AMPs or BPs are "wrong."  Plaintiffs' pleading cannot be saved by

12  their inclusion in the TAC of allegations that they purchased drugs (*see* TAC ¶ 42), OIG reports

13  regarding alleged overcharging by unnamed companies at irrelevant times (*see* TAC ¶¶ 50-58),

14  and settlement agreements that certain defendants entered into with the federal government

15  regarding "best price" calculations for a few particular drugs and particular time periods.  *See*

16  TAC ¶¶ 59-64.  These references do not support broad, non-specific allegations of

17  "miscalculations" by all defendants, especially where plaintiffs have never articulated a theory

18  of how miscalculations allegedly occurred.

19      Plaintiffs' recent discovery requests show they are intent on not limiting their claims in

20  this case to any particular drug or time period or defendant, by reference to any OIG report or

21  otherwise.  Indeed, any claims based on the past acts to which plaintiffs advert in such reports,

22  or in settlements, are either barred or settled and are not even *included* in this case.  Such

23  allegations do not support an allegation that some other claims may exist.

24      The TAC acknowledges that the 2004 Report was withdrawn by the OIG due to

25  questions regarding its underlying data.  *See* TAC ¶ 52.[17]  Irrelevant OIG reports are therefore

26

---

27  [17] Although plaintiffs speculate "on information and belief" that the OIG withdrew the June 2004 Report because of "pressure from the pharmaceutical industry" (TAC ¶ 56), the OIG's

28                                        (continued…)

1   no basis upon which to speculate that plaintiffs have been overcharged by these defendants.

2   Neither OIG report identifies the manufacturers or drugs that were the subject of the report, and

3   even if one accepts plaintiffs' assertion that the 2003 OIG Report involved defendants Aventis

4   Pharmaceuticals, Bristol-Meyers Squibb, TAP Pharmaceutical Products, and GlaxoSmithKline

5   (*see* TAC ¶ 50), the 2003 OIG report scrutinized BP issues relating to sales occurring during the

6   one-year period ending September 30, 1999, which was two years *before* the limitations period

7   for this case commenced.  *See* Dkt. Entry No. 496, at 2:18-24.  As this Court previously held, an

8   allegation that there were BP miscalculations in 1998-99 has no relevance to whether there were

9   any such miscalculations during the time-period after 2001 involved in this lawsuit.  *See* Dkt.

10  Entry No. 212, at 5.  As such, these allegations do not allow the Court to draw the "reasonable

11  inference" that all or any of the defendants are "liable for the misconduct alleged." *Iqbal*, 129

12  S. Ct. at 1949.

13          Plaintiffs also refer to settlement agreements that AstraZeneca, Merck (then Schering-

14  Plough Corporation), Pfizer and TAP entered into regarding the Medicaid Drug Rebate

15  Program's requirement to report their "best price" for particular drugs.  *See* TAC ¶¶ 59-62.

16  Plaintiffs then make the unsubstantiated leap – impermissible under *Iqbal* and *Twombly* – that

17  because plaintiffs purchased drugs from these four manufacturers in *settled* claims that are *not*

18  part of this case, plaintiffs *may have been* overcharged for *other* drugs at *other* times.  As noted

19  above, such allegations, even if they were for relevant time periods which in many cases they

20  are not,[18] would not support plaintiffs' broader breach of contract claims.  And plaintiffs make

21  no specific allegations whatsoever concerning certain defendants, including Bayer and Wyeth.

22  _____

(…continued)

23  subsequent report makes clear that the June 2004 Report was withdrawn because of concerns
    about its accuracy, not because of outside pressure.  *See* RJN, Ex. O (HHS OIG, October

24  2006, Report OEI-05-02-00072), at i-ii, 1, 13-15.  In fact, the OIG's October 2005 Report
    entitled "Deficiencies in the Oversight of the 340B Drug Pricing Program" noted that the

25  OIG's continuing investigation had uncovered a number of problems with the CMS ceiling

26  price data used in the June 2004 Report, leading to its withdrawal.  *Id.*

27  [18] As with the OIG reports, many of the settlement agreements are based on conduct alleged to
    have occurred prior to the limitations period applicable to this case.  *See* Dkt. Entry No. 496,

28                                                                              (continued…)

1    As the Supreme Court held, "it should not prove burdensome for a plaintiff who has

2  suffered an economic loss to provide a defendant with some indication of the loss and the causal

3  connection that the plaintiff has in mind." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336,

4  347 (2005) (citing H.R. Conf. Rep. No. 104-369, p. 31 (1995), U.S. Code Cong. & Admin.

5  News 1995, p. 679, 930 (criticizing "the routine filing of lawsuits . . . with only [a] faint hope

6  that the discovery process might lead eventually to some plausible cause of action.")).

7  Plaintiffs' admittedly vague and unfounded allegations are precisely the type that Rule 8 is

8  designed to prevent so that plaintiffs "with a largely groundless claim [do not] simply take up

9  the time of a number of other people . . . ." *Dura Pharmaceuticals*, 544 U.S. at 347 (quoting

10  *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741 (1975)).

11    "[I]t is plaintiffs' duty to investigate and discover the factual bases of their claims *before*

12  filing a complaint; discovery is not an open range for plaintiffs to ride roughshod in the hope

13  that their claims may find support." *Rojas v. Brinderson Constructors Inc.*, 567 F. Supp. 2d

14  1205, 1212 (C.D. Cal. 2008) (emphasis added).  Even accepting every allegation in the TAC as

15  true and viewing them in the light most favorable to the plaintiffs, the TAC clearly "fail[s] to

16  state a claim upon which relief can be granted" and judgment should be entered for defendants

17  that the TAC fails to state a claim of breach based upon alleged AMP and BP miscalculation.[19]

18

19

20

---

21  (…continued)
     at 2:18-24.  By way of example, plaintiffs simply state that "[o]n October 28, 2002, Pfizer
22    agreed to pay $9 million to settle allegations that it violated the Medicaid Drug Rebate
       Program."  TAC ¶ 61.  Plaintiffs do not state what the alleged violations of the Medicaid Drug
23    Rebate Program are that caused plaintiffs to be overcharged.  Further, Pfizer's settlement
       agreement relates to conduct that is alleged to have occurred in 1999 by an entity (Warner
24    Lambert) for one drug (Lipitor) that Pfizer was not even associated with at the time.  *See* RJN,
       Ex. P.  Furthermore, the AstraZeneca plea agreement cited (TAC ¶ 60) pertains to a free
25    sampling issue and involves an inpatient drug, Zoladex, that was not even purchased by
       plaintiffs.  *See* RJN, Ex. C; Mayo Decl., ¶ 19.

26  [19] Accordingly, plaintiffs should be required to amend their complaint to provide additional
       specific facts regarding the transactions and the drugs for which they were overcharged.  *See*
27  Fed. R. Civ. P. 12 (b)(6); *see also Iqbal*, 129 S. Ct. at 1954; *Twombly*, 550 U.S. at 555.

28

B.      Discovery Should be Barred Because it Would be Inconsistent with
        Confidentiality Obligations under the Social Security Act.

1

2          As the Secretary has concluded, when plaintiffs seek data underlying AMP and BP,

3   "plaintiff's suit is contrary to the Social Security Act's confidentiality provisions," and

4   "permitting plaintiff's challenge would conflict with Congress's comprehensive administrative

5   and enforcement scheme, and accord plaintiff contract rights never intended by the PPA's

6   signatories." Amicus Brief at 13. Accordingly, "allowing discovery of data underlying AMP

7   and Best Price reports would violate the Social Security Act." *Id.* at 19.

8          The Social Security Act states that "[n]otwithstanding any other provision of law,

9   information disclosed by manufacturers . . . under [42 U.S.C., § 1396r-8(b) ] . . . is confidential

10  and shall not be disclosed by the Secretary . . . in a form which would disclose the identity of a

11  specific manufacturer . . . [or] . . . prices charged for drugs by such manufacturer." 42 U.S.C.

12  § 1396r-8(b)(3)(D). Section 1396r-8(b) requires, among other things, that manufacturers

13  provide the government with their AMPs and BPs. *See* 42 U.S.C. § 1396r-8(b)(3)(A). But it

14  was never the intention of the contract that plaintiffs would be given the right to the data:

15  "Although the manufacturers would be providing the information in discovery, a third-party

16  beneficiary's entitlement to discovery would ultimately arise from the Secretary's agreement

17  [*i.e.*, the PPA], and thus the data would still be indirectly 'disclosed by the Secretary.'" Amicus

18  Brief at 20. Accordingly, the Secretary could hardly intend that a third party beneficiary would

19  have access to the information; on the contrary, "[p]ermitting the requested discovery would

20  undermine the statutory scheme and contravene the intent of the PPA's signatories." *Id.* at 21.

21  The Act gives HHS the authority to regulate manufacturers (*e.g.*, audit and investigation rights,

22  the power to impose monetary sanctions and terminate manufacturers' participation in the

23  Medicaid Rebate Program (and therefore the 340B Program)). *See id.* at 19. "By focusing

24  enforcement within the government, the statutory scheme lets manufacturers determine the

25  standards by which their AMP and Best Price submissions will be judged:  HHS's

26  understanding of the relevant requirements." *Id.*

27

28

1  **C.**     In the Alternative, the Court Should Enter a Protective Order Prohibiting Further
2             Discovery Unless Plaintiffs Clarify the Nature of Their Claim.

3          1.     This Court has Broad Discretion to Manage its Docket and Discovery.

4          District courts have broad discretionary powers to manage their cases in general and

5   especially pretrial discovery.  *See Poulin v. Greer*, 18 F.3d 979, 986 (1st Cir. 1994) (affirming

6   denial of motion to compel where no clear showing of manifest injustice).[20]  The Court's

7   inherent powers are "governed not by rule or statute but by the control necessarily vested in

8   courts to manage their own affairs so as to achieve the orderly and expeditious disposition of

9   cases."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Link v. Wabash R.R. Co.*,

10  370 U.S. 626, 630-31 (1962) (dismissal of action because of unreasonable delays by counsel in

11  bringing case to trial is within court's power)).  Indeed, this Court has "[b]road discretion . . . to

12  permit or deny discovery, and its decision to deny discovery will not be disturbed except upon

13  the clearest showing that denial of discovery results in actual and substantial prejudice to the

14  complaining litigant."  *Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002) (quoting

15  *Goehring v. Brophy*, 94 F.3d 1294, 1305 (9th Cir. 1996)) (internal quotations omitted)

16  (affirming denial of discovery where disputed evidence "only minimally relevant" to plaintiffs'

17  case).  The Court's discretion also applies to determining relevance and whether discovery

18  sought relates to the claims and defenses properly asserted in the pleadings.  *See* 6 Moore's

19  Federal Practice, § 26.41 (Matthew Bender 3d ed.); *see also Food Lion v. United Food &*

20  *Commer. Workers Int'l Union*, 103 F.3d 1007, 1012 (D.C. Cir. 1997) (trial courts have

21

22

23  _____

24  [20] Stated another way, "[t]rial courts enjoy a broad measure of discretion in managing pretrial
         affairs, including the conduct of discovery.  Decisions regarding the scope of discovery, the
25       allocation of expenses, the most appropriate areas for enforced economy, and the protections
         to be afforded parties in the discovery process, are ordinarily left to the informed judgment of
26       the district judge, who is in a unique position to gauge and balance the potentially conflicting
         interests at stake."  *In re Recticel Foam Corp.*, 859 F.2d 1000, 1006 (1st Cir. 1988) (denying
27       interlocutory appeal of case management order).

28

1   considerable discretion in handling discovery matters, and their decisions are reviewable only

2   for abuse of discretion).[21]

3          The "relevance standard of Rule 26 is not without bite" and discovery may be denied

4   where the information sought is simply too remote to any matter involved in the case.[22]  The

5   provisions of Rule 26:

6          [C]reate many options for the district judge.  For instance, the court may at first
           permit the plaintiff to take only a focused deposition of the defendant before
7          allowing any additional discovery . . . .  Alternatively, the court may postpone all
           inquiry regarding the official's subjective motive until discovery has been had on
8          objective factual questions . . . .  The trial judge can therefore manage the
           discovery process to facilitate prompt and efficient resolution of the lawsuit . . . .
9

10   *Crawford-El v. Britton*, 523 U.S. 574, 599 (1998).

11          Relevance should be determined by allegations of actual claims, not claims that might

12   exist.  The discovery rules "are designed to assist a party to prove a claim it reasonably believes

13   to be viable *without discovery*, not to find out if it has any basis for a claim."  *Micro Motion,*

14   *Inc. v. Kane Steel Co., Inc.*, 894 F.2d 1318, 1327 (Fed. Cir. 1990) (emphasis in original).  "That

15   the discovery might uncover evidence showing that a plaintiff has a legitimate claim does not

16   justify the discovery request."  *Id.* (citation omitted)*; see also Samsung SDI Co., Ltd. v.*

17   *Matsushita Elec. Indus. Co., Ltd.*, No. CV 05-8493-AG(SHx), 2007 WL 4302701 at *3

18   (C.D. Cal. June 27, 2007) (citing *Micro Motion* and affirming denial of discovery where

19   requesting party sought "to engage in a fishing expedition").  Requested discovery is not

20

---

21   [21] *See also* Fed. R. Civ. P. 26(b)(1) Advisory Committee's Note (2000) ("Under the amended
     provisions, if there is an objection that discovery goes beyond material relevant to the parties'
22   claims or defenses, the court would become involved to determine whether the discovery is
     relevant to the claims or defenses and, if not, whether good cause exists for authorizing it so
     long as it is relevant to the subject matter of the action.").  Moreover, the Advisory Committee
23   "intends that the parties and the court focus on the actual claims and defenses involved in the
     action." *Id.*

24   [22] *Food Lion, Inc.*, 103 F.3d at 1012.  *See also id.* at 1012-13 ("[T]he standard of relevancy . . .
     is not so liberal as to allow a party to . . . explore matter which does not presently appear
25   germane on the theory that it might conceivably become so.") (citing *In re Fontaine*, 402 F.
     Supp. 1219, 1221 (E.D.N.Y. 1975)) (internal quotations omitted); *Epstein v. MCA, Inc.*,
26   54 F.3d 1422, 1423 (9th Cir. 1995) (holding that district court abused its discretion in
     allowing discovery of documents that "would have no bearing on either the merits of the case
27   or on the motion for class certification" and that therefore were irrelevant).

28

702027609v1                          - 20 -        DEFS' JOINT MOTION FOR PARTIAL
                                                   JUDGMENT ON THE PLEADINGS OR,  PROTECTIVE
                                                   ORDER ETC.-CASE NO. C 05-03740 WHA

1  relevant to the subject matter involved in a pending action if the inquiry is only based on the

2  requesting party's mere suspicion or speculation.  *See Sirota v. Penske Truck Leasing Corp.*,

3  No. C05-03296 SI, 2006 WL 708910 at *3 (N.D. Cal. March 17, 2006) (limiting discovery

4  where requesting party's primary theory of relevance was "too speculative").

5          Here, case management would be served by requiring plaintiffs to articulate a plausible

6  basis *and nature* of the claimed AMP and BP miscalculations.  *Koch v. Koch Industries, Inc.*,

7  203 F.3d 1202, 1238 (10th Cir. 2000), *cert. denied*, 531 U.S. 926 (2000), illustrates this point.

8  There, the Tenth Circuit held that the district court properly limited discovery where the

9  plaintiffs sought discovery in an attempt to shore up their conclusory allegations:

10          The Plaintiffs attempted to justify their extraordinarily expansive discovery
        requests as relevant to two broad, non-specific allegations contained in their
11          Second Amended Complaint. *When a plaintiff first pleads its allegations in
        entirely indefinite terms, without in fact knowing of any specific wrongdoing by
12          the defendant, and then bases massive discovery requests upon those nebulous
        allegations, in the hope of finding particular evidence of wrongdoing, that
13          plaintiff abuses the judicial process*.  That is what occurred here. The limits
        which Rule 26(b)(2)(iii) place upon discovery are aimed at just such a tactic.
14

15  *Id.* (footnote omitted).  The Tenth Circuit affirmed the district court's exercise of its

16  discretionary power that "appropriately recognized that the likely benefit of this attempted

17  fishing expedition was speculative at best."  *Id.* at 1238; *see also Collens v. City of New York*,

18  222 F.R.D. 249, 253 (S.D.N.Y. 2004) ("While Rule 26(b)(1) still provides for broad discovery,

19  courts should not grant discovery requests based on pure speculation that amount to nothing

20  more than a 'fishing expedition' into actions or past wrongdoing not related to the alleged

21  claims or defenses.").

22                  2.      Such Case Management is Particularly Appropriate to Cause Plaintiffs to
                    Articulate Their Claim.
23

24          Plaintiffs have been allowed to explore the smaller issue whether there were errors in

25  calculations between reported AMP and BP figures and the calculated 340B ceiling prices,

26  which *was* the subject of the 2004 OIG report.  The result of that demonstrates that plaintiffs'

27  suspicions lacked substantial merit.  As an example, plaintiffs demanded, and Merck provided,

28

1  years of data regarding the calculation of ceiling prices.  Plaintiffs still refused to identify

2  whether there were any overcharges, until Judge Chen ordered them to do so.  The result of

3  lengthy examination of years of data, and a motion for and an order compelling an answer, was

4  that Santa Clara identified *zero* overcharges on any transaction – though it did identify that it

5  was undercharged $4.86.[23]  The process leading to that conclusion was expensive, consuming

6  months of time and considerable data, but the resulting waste would be dwarfed if plaintiffs are

7  allowed to do the same thing again as to information underlying AMP and BP.

8          Additionally, such case management would help frame the issue of primary jurisdiction.

9  "[P]rimary jurisdiction is properly invoked when a claim is cognizable in federal court but

10  requires resolution of an issue of first impression, or of a particularly complicated issue that

11  Congress has committed to a regulatory agency." *Santa Clara II*, at 1251 (quoting *Syntek*

12  *Semiconductor Co., Ltd. v. Microchip Tech. Inc.*, 307 F.3d 775, 780 (9th Cir. 2002)).

13          As the Ninth Circuit and the Secretary recognized, this case may trigger the doctrine of

14  primary jurisdiction, depending on the type of claims plaintiffs are making about AMP and BP.  In

15  her brief, the Secretary described a variety of issues relating to calculation of AMP and BP that fall

16  within the category of matters within her primary jurisdiction, including claims challenging

17  defendants' "reasonable assumptions" or "from debatable interpretations of CMS guidance.

18  Disputes of *that* nature implicate HHS's expertise regarding complex regulatory questions."

19  Amicus Brief at 14.  The early clarification of the nature of plaintiffs' claims will undoubtedly

20  inform this Court's primary jurisdiction determination.

21      D.    <u>Even if Plaintiffs Were Entitled to Discovery, the Scope of Discovery Should Be</u>
            <u>Limited.</u>

22

23          Rule 26(c) of the Federal Rules of Civil Procedure provides this Court wide latitude when

24  defining the scope and extent of discovery on a motion for protective order.  *See, e.g.*, *United*

25  _____

[23] At his October 21, 2009 deposition, Narinder Singh, Santa Clara's Director of Pharmacy
26     Services and the Santa Clara employee who verified Santa Clara's supplemental answer,
       confirmed that the $4.86 undercharge was the county's current "overcharge" analysis
27     regarding Merck.  *See* Kemp Dec., ¶¶ 7-12, Exs. 6-9.

28

1   *States v. Shryock*, 342 F.3d 948, 983 (9th Cir. 2003) (district court did not abuse its discretion by

2   issuing protective orders).[24]  Plaintiffs have gone well beyond what this Court's December 17

3   Order would have allowed, and their proposed discovery is demonstrably burdensome.

4          Rule 26(b) imposes specific limits on the discovery of electronically stored information

5   that is not reasonably accessible because of undue burden or cost.  *See, e.g.*, *Zubulake v. UBS*

6   *Warburg LLC*, 217 F.R.D. 309, 318 (S.D.N.Y. 2003) ("whether production of documents is

7   unduly burdensome or expensive turns primarily on whether it is kept in an accessible or

8   inaccessible format (a distinction that corresponds closely to the expense of production)").

9          First, the Court's December 17, 2009 Order stated:

10         [D]iscovery will be reopened for the limited purpose of allowing plaintiffs to
           take discovery regarding the information underlying defendants manufacturers'
           determinations of the AMP and the BP.

11

12         On or before January 7, 2010, plaintiffs shall serve to each defendant document
           requests and up to five interrogatories directed to the underlying data.

13  Dkt. Entry No. 549, at 2:7-11.  On their face, plaintiffs' recent document request and

14  interrogatories seek information well beyond that restricted scope (*see* Kemp Decl., ¶¶ 5, 6, Exs.

15  4, 5), and discovery should be limited accordingly.[25]

16         Second, as demonstrated by fifteen of the concurrently filed declarations, it would be

17  unduly burdensome and prohibitively expensive for defendants to prepare, review and produce

18  much of the discovery sought.  These declarations provide the Court with concrete evidence of

19  the burden that compliance with the requests would cause.  *See* Bronstein Decl.; Missaggia

20  Decl.; McRae Decl.; Prokop Decl.; Larkin Decl.; Brown Decl.; Ekwensi Decl.; Le Compte

21

22

23  [24] *See also Flatow v. Islamic Republic of Iran*, 308 F.3d 1065, 1069, 074 (9th Cir. 2002)
24  (applying abuse of discretion standard, affirming grant of protective order and noting that "the
    court has 'extensive control' over the discovery process") (quoting *United States v. Columbia*
25  *Broad. System, Inc.,* 666 F.2d 364, 369 (9th Cir. 1982)).

    [25] Defendants understand plaintiffs intend that their discovery requests are to be read as limited
26  by the Court's December 17, 2009 Order (*see* Kemp Decl., ¶ 17), so this may be a moot issue.
    If it is not, the Court should limit any needed response by defendants to plaintiffs discovery.
27  *See id.*, ¶ 22.

28

1  Decl.; Weiglein Decl.; Dynan Black Decl.; Boccuti Decl.; Kane Decl.; Dwyer Decl.; Mayo

2  Decl.; and, Schechter Decl.  For these reasons, discovery should also be limited accordingly.

3       Finally, pursuant to the Court's directive to defendants during the December 17, 2009

4  hearing to include all reasons for resisting discovery in their February 4, 2010 filings,

5  defendants also object to the requests on the basis of applicable privileges.  As also

6  demonstrated by the concurrently filed declarations, discovery into "information" underlying

7  AMP and BP necessarily would include privileged information.  *See* Declarations, *supra*.

8  Consistent with Rule 26(b)(1), defendants should not be required to produce such information.[26]

9       E.       <u>Moreover, Any Discovery Should be Deferred Until the Ninth Circuit Rules on

10               Defendants' Pending Petition.</u>

11       Defendants filed their petition for panel rehearing and rehearing *en banc* in the Ninth

12  Circuit on December 30, 2009.  *See* RJN, at Ex. B.  As of the date of this filing, the Ninth

13  Circuit has not addressed defendants' petition.  Given the Ninth Circuit's express permission to

14  the parties to file petitions for rehearing and the importance of the issues raised herein,

15  defendants respectfully request this Court defer permitting the requested discovery until the

16  Ninth Circuit addresses defendants' petition.

17

18

19

20

21

22

23

24

25

---

26  [26] During the meet and confer process, defendants made plaintiffs' counsel aware that they

26  would be interposing this objection.  For example, counsel to Merck advised plaintiffs'
    counsel that, if discovery goes forward, an appropriate privilege log will be produced.  *See*

27  Kemp Decl., ¶ 19.

28

DEFS' JOINT MOTION FOR PARTIAL
                                              JUDGMENT ON THE PLEADINGS OR,  PROTECTIVE
                                              ORDER ETC.-CASE NO. C 05-03740 WHA

1    IV.    CONCLUSION.

2           For the reasons stated above, defendants' motion for partial judgment on the pleadings

3    or, in the alternative, for protective order should be granted.

4           Dated:  February 4, 2010.

5                                            PILLSBURY WINTHROP SHAW PITTMAN LLP
                                             KIRKE M. HASSON
6                                            COLIN T. KEMP
                                             50 Fremont Street
7                                            Post Office Box 7880
                                             San Francisco, CA  94120-7880

8

9
                                             By _____ /s/ Kirke M. Hasson _____
10                                                      KIRKE M. HASSON
                                             Attorneys for Defendant MERCK & CO.,
11                                           INC., and on Behalf of all Defendants for
                                             Purposes of This Motion
12

13

14

15

16

17

18

19

20

21   **DECLARATION PURSUANT TO GENERAL ORDER 45, § X.B**

22          I, COLIN T. KEMP, hereby declare pursuant to General Order 45, § X.B, that I have

23   obtained the concurrence in the filing of this document from Mr. Hasson.

24          I declare under penalty of perjury of the laws of the United States of America that the

25   foregoing declaration is true and correct.

26          Executed on February 4, 2010, at San Francisco, California.
                                            ____//s//  Colin T. Kemp_____
27

28

702027609v1                        - 25 -     DEFS' JOINT MOTION FOR PARTIAL
                                              JUDGMENT ON THE PLEADINGS OR,  PROTECTIVE
                                              ORDER ETC.-CASE NO. C 05-03740 WHA